## HENNINGTON *v.* GEORGIA.

ERROR TO THE SUPREME COURT OF THE STATE OF GEORGIA.

No. 150. Argued March 17, 18, 1896. — Decided May 18, 1896.

The legislation of the State of Georgia, contained in §§ 4578 and 4310 of the Code of 1882, forbidding the running of freight trains on any railroad in the State on Sunday, and providing for the trial and punishment, on conviction, of the superintendent of a railroad company violating that provision, although it affects interstate commerce in a limited degree, is not, for that reason, a needless intrusion upon the domain of Federal jurisdiction, nor strictly a regulation of interstate commerce, but is an ordinary police regulation, designed to secure the well-being, and to promote the general welfare of the people within the State, and is not invalid by force alone of the Constitution of the United States ; but is to be respected in the courts of the Union until superseded and displaced by some act of Congress, passed in execution of the power granted to it by the Constitution.

There is nothing in the legislation in question in this case that suggests that it was enacted with the purpose to regulate interstate commerce, or with any other purpose than to prescribe a rule of civil duty for all who, on the Sabbath day, are within the territorial jurisdiction of the State.

THE case is stated in the opinion.

*Mr. Edward Colston* for plaintiff in error. *Mr. George Hoadly, Jr.*, was on his brief.

*Mr. J. M. Terrell* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiff in error, Hennington, superintendent of transportation, and having charge of the freight business of the Alabama Great Southern Railroad Company, was indicted in the Superior Court of Dade County, Georgia, for the offence of having, on the 15th day of March, 1891 — that being the Sabbath day — unlawfully run a freight train on the Alabama Great Southern Railroad in that county.

The statute under which the prosecution was instituted is as follows: "Code of Georgia, 1882, Sec. 4578. If any freight train shall be run on any railroad in this State on the Sabbath day (known as Sunday), the superintendent of transportation of such railroad company, or the officer having charge of the business of that department of the railroad, shall be liable for indictment for a misdemeanor in each county through which such train shall pass, and, on conviction, shall be for each offence punished as prescribed in section 4310 of this code. On such trial it shall not be necessary to allege or prove the names of any of the employés engaged on such train, but the simple fact of the train being run. The defendant may justify himself by proof that such employés acted in direct violation of the orders and rules of the defendant: *Provided, always,* That whenever any train on any railroad in this State, having in such train one or more cars loaded with live stock, which train shall be delayed beyond schedule time, shall not be required to lay over on the line of road or route during Sunday, but may run on to the point where, by due course of shipment or consignment, the next stock pen on the route may be, where said animals may be fed and watered, according to the facilities usually afforded for such transportation. And it shall be lawful for all freight trains on the different

railroads in this State, running over said roads on Saturday night, to run through to destination : *Provided,* The time of arrival, according to the schedule by which the train or trains started on the trip, shall not be later than eight o'clock on Sunday morning."

Section 4310, referred to in the section just quoted, is as follows :

" Accessories after the fact, except where it is otherwise ordered in this code, shall be punished by a fine not to exceed one thousand dollars, imprisonment not to exceed six months, to-work in the chain-gang on the public works, or on such other works as the county authorities may employ the chain-gang, not to exceed twelve months, and any one or more of these punishments may be ordered in the discretion of the judge : *Provided,* That nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor."

The defendant pleaded not guilty. He also pleaded specially certain facts which, he averred, showed that the statute of Georgia, as applied to this case, was in conflict with the provision of the Constitution of the United States giving Congress power to regulate commerce among the States.

At the trial the defendant admitted that he was superintendent of transportation of the Alabama Great Southern Railroad, the property of the Alabama Great Southern Railroad Company, a corporation of Alabama; that the line of that railroad began at the city of Chattanooga, Tennessee, extended nine miles through that State, when it entered the county of Dade, Georgia, and ran through that county and over the line of road constructed and operated originally by the Wills Valley Railroad Company, into Alabama; thence through Alabama two hundred and forty-five miles, and into Mississippi, to the city of Meridian, where it connected with other roads; that said company was acting as a common carrier of passengers and freight along its line, using engines and cars propelled by steam; that on the day mentioned in the in-

dictment the company, by its superintendent of transportation, the defendant, ran over its line of road from Chattanooga, Tennessee, through Georgia and Alabama to Meridian, Mississippi, a train of cars laden with freight for points beyond the limits of Georgia, the train having been loaded in Tennessee with freight destined for points outside and beyond the limits of Georgia.

· The defendant contended that the statute, if applied to these facts, was repugnant to the Constitution of the United States. This contention was overruled and the jury were instructed that, under the facts admitted, the defendant was guilty. The jury accordingly found him guilty as charged in the indictment.

The case was taken to the Supreme Court of Georgia, and it was assigned for errror that the trial court refused to adjudge section 4578 of the Code of Georgia, when applied to the admitted facts, to be repugnant to the commerce clause of the Constitution.

The Supreme Court of Georgia held the statute, under which the prosecution was instituted, to be a regulation of internal police and not a regulation of commerce; that it was not in conflict with the Constitution of the United States even as to freight trains passing through the State from and to adjacent States, and laden exclusively with freight received on board before the trains entered Georgia and consigned to points beyond its limits.

As the judgment of the Supreme Court of Georgia denied to the defendant a right or immunity specially set up and claimed by him under the Constitution of the United States, no question is or can be made as to the jurisdiction of this court to review that judgment.

If the statute in question forbidding the running in Georgia of railroad freight trains, on the Sabbath day, had been expressly limited to trains laden with domestic freight, it could not be regarded otherwise than as an ordinary police regulation established by the State under its general power to protect the health and morals, and to promote the welfare, of its people.

From the earliest period in the history of Georgia it has been the policy of that State, as it was the policy of many of the original States, to prohibit all persons, under penalties, from using the Sabbath as a day for labor and for pursuing their ordinary callings. By an act of the Colonial legislature of Georgia, approved March 4, 1762, it was provided: "No tradesman, artificer, workman, laborer or other person whatsoever shall do or exercise any worldly labor, business or work of their ordinary callings, upon the Lord's day, or any part thereof (works of necessity or charity only excepted), and that every person being of the age of fifteen years or upwards, offending in the premises, shall, for every such offence, forfeit the sum of ten shillings. And that no person or persons whatsoever shall publicly cry, show forth, or expose to sale, any wares, merchandise, fruit, herbs, goods or chattels whatsoever upon the Lord's day, or any part thereof, upon pain that every person so offending shall forfeit the same goods so cried or showed forth, or exposed to sale, or pay ten shillings." 2 Cobb's New Dig. Laws, Georgia, 853. This act is substantially preserved in section 4579 of the Code of Georgia. And by an act approved February 11, 1850, it was provided: "That from and after the 1st day of March next it shall not be lawful for any company or individual to run any freight train or any car carrying freight upon any railroad now existing, or that may hereafter be made, in this State, on the Sabbath day; and any conductor or other person so running or assisting in running any train or car carrying freight on the Sabbath day shall each be guilty of a misdemeanor, and on conviction thereof each conductor shall be fined in a sum not exceeding five hundred dollars." 1 Cobb's New Dig. Laws, Georgia, 399. This act was amended by substituting "superintendent of transportation" for "conductor," and in other particulars, not important to be mentioned, and as amended it constitutes section 4578 of the Criminal Code, under the heading of "Offences against public morality, health, police," etc. Code of Georgia, 1882.

In what light is the statute of Georgia to be regarded? The well settled rule is, that if a statute purporting to have

been enacted to protect the public health, the public morals or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution. *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313, 350.

In our opinion there is nothing in the legislation in question which suggests that it was enacted with the purpose to regulate interstate commerce, or with any other purpose than to prescribe a rule of civil duty for all who, on the Sabbath day, are within the territorial jurisdiction of the State. It is none the less a civil regulation because the day on which the running of freight trains is prohibited is kept by many under a sense of religious duty. The legislature having, as will not be disputed, power to enact laws to promote the order and to secure the comfort, happiness and health of the people, it was within its discretion to fix the day when all labor, within the limits of the State, works of necessity and charity excepted, should cease. It is not for the judiciary to say that the wrong day was fixed, much less that the legislature erred when it assumed that the best interests of all required that one day in seven should be kept for the purposes of rest from ordinary labor. The fundamental law of the State committed these matters to the determination of the legislature. If the law making power errs in such matters, its responsibility is to the electors, and not to the judicial branch of the government. The whole theory of our government, Federal and state, is hostile to the idea that questions of legislative authority may depend upon expediency, or upon opinions of judges as to the wisdom or want of wisdom in the enactment of laws under powers clearly conferred upon the legislature. The legislature of Georgia no doubt acted upon the view that the keeping of one day in seven for rest and relaxation was " of admirable service to a State considered merely as a civil institution." 4 Bl. Com. * 63. The same view was expressed by Mr. Justice Field in *Ex parte Newman*, 9 California, 502, 519, 528, when, referring to a statute of California relating to

the Sabbath day, he said: "Its requirement is a cessation from labor. In its enactment, the legislature has given the sanction of law to a rule of conduct, which the entire civilized world recognizes as essential to the physical and moral well-being of society. Upon no subject is there such a concurrence of opinion, among philosophers, moralists and statesmen of all nations, as on the necessity of periodical cessation from labor. One day in seven is the rule, founded in experience and sustained by science. . . . The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted."

So, in *Bloom* v. *Richards*, 2 Ohio St. 387, 391, Judge Thurman, delivering the unanimous judgment of the Supreme Court of Ohio, said: "We are, then, to regard the statute under consideration as a mere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the general assembly to require the cessation of labor, and to name the day of rest."

To the same general effect are many cases: *Specht* v. *Commonwealth*, 8 Penn. St. 312, 322; *Commonwealth* v. *Has*, 122 Mass. 40, 42; *Frolickstein* v. *Mobile*, 40 Alabama, 725; *Ex parte Andrews*, 18 California, 678, in which the dissenting opinion of Mr. Justice Field in *Ex parte Newman*, 9 California, 502, was approved; *State* v. *Railroad*, 24 W. Va. 783; *Scales* v. *State*, 47 Arkansas, 476, 482; *State* v. *Ambs*, 20 Missouri, 214; *Mayor &c.* v. *Linck*, 12 Lea, 499, 515.

The same principles were announced by the Supreme Court of Georgia in the present case. As the contention is that that court erred in not adjudging the statute in question to be unconstitutional, it is appropriate that the grounds upon which it proceeded should fully appear in this opinion. That court, speaking by Chief Justice Bleckley, said: "There can be no

well founded doubt of its being a police regulation, considering it merely as ordaining the cessation of ordinary labor and business during one day in every week; for the frequent and total suspension of the toils, cares and strain of mind or muscle incident to pursuing an occupation or common employment, is beneficial to every individual, and incidentally to the community at large, the general public. Leisure is no less essential than labor to the well-being of man. Short intervals of leisure at stated periods reduce wear and tear, promote health, favor cleanliness, encourage social intercourse, afford opportunity for introspection and retrospection, and tend in a high degree to expand the thoughts and sympathies of people, enlarge their information, and elevate their morals. They learn how to be, and come to realize that being is quite as important as doing. Without frequent leisure, the process of forming character could only be begun; it could never advance or be completed; people would be mere machines of labor·or business—nothing more. If a law which, in essential respects, betters for all the people the conditions, sanitary, social and individual, under which their daily life is carried on, and which contributes to insure for each, even against his own will, his minimum allowance of leisure, cannot be rightfully classed as a police regulation, it would be difficult to imagine any law that could."

That court further said: "With respect to the selection of the particular day in each week which has been set apart by our statute as the rest day of the people, religious views and feelings may have had a controlling influence. We doubt not that they did have; and it is probable that the same views and feelings had a very powerful influence in dictating the policy of setting apart any day whatever as a day of enforced rest. But neither of these considerations is destructive of the police nature and character of the statute. If good and sufficient police reasons underlie it, and substantial police purposes are involved in its provisions, these reasons and purposes constitute its civil and legal justification, whether they were or not the direct and immediate motives which induced its passage, and have for so long a

time kept it in force. Courts are not concerned with the mere beliefs and sentiments of legislators, or with the motives which influence them in enacting laws which are within legislative competency. That which is properly made a civil duty by statute is none the less so because it is also a real or supposed religious obligation; nor is the statute vitiated, or in anywise weakened, by the chance, or even the certainty, that in passing it the legislative mind was swayed by the religious rather than by the civil aspect of the measure. Doubtless it is a religious duty to pay debts, but no one supposes that this is any obstacle to its being exacted as a civil duty. With few exceptions, the same may be said of the whole catalogue of duties specified in the Ten Commandments. Those of them which are purely and exclusively religious in their nature cannot be, or be made civil duties, but all the rest of them may be, in so far as they involve conduct as distinguished from mere operations of mind or states of the affections. Opinions may differ, and they really do differ, as to whether abstaining from labor on Sunday is a religious duty; but whether it is or is not, it is certain that the legislature of Georgia has prescribed it as a civil duty. The statute can fairly and rationally be treated as a legitimate police regulation, and thus treated, it is a valid law. There is a wide difference between keeping a day holy as a religious observance and merely forbearing to labor on that day in one's ordinary vocation or business pursuit." *Hennington* v. *Georgia*, 90 Georgia, 396, 397–399.

Assuming, then, that both upon principle and authority the statute of Georgia is, in every substantial sense, a police regulation established under the general authority possessed by the legislature to provide, by laws, for the well-being of the people, we proceed to consider whether it is in conflict with the Constitution of the United States.

The defendant contends that the running on the Sabbath day of railroad cars, laden with interstate freight, is committed exclusively to the control and supervision of the National Government; and that, although Congress has not taken any affirmative action upon the subject, state legislation interrupt-

ing, even for a limited time only, interstate commerce, what-
ever may be its object and however essential such legislation
may be for the comfort, peace and safety of the people of the
State, is a regulation of interstate commerce forbidden by the
Constitution of the United States. Is this view of the Con-
stitution and of the relations between the States and the
General Government sustained by the former decisions of this
court? Is the admitted general power of a State to provide
by legislation for the health, the morals and the general
welfare of its people, so fettered that it may not enact any
law whatever that relates to or affects in any degree the con-
duct of commerce among the States? If the people of a State
deem it necessary to their peace, comfort and happiness, to
say nothing of the public health and the public morals, that
one day in each week be set apart by law as a day when
business of all kinds carried on within the limits of that State
shall cease, whereby all persons of every race and condition
in life may have an opportunity to enjoy absolute rest and
quiet, is that result, so far as interstate freight traffic is con-
cerned, attainable only through an affirmative act of Congress
giving its assent to such legislation?

The argument in behalf of the defendants rests upon the
erroneous assumption that the statute of Georgia is such a
regulation of interstate commerce as is forbidden by the Con-
stitution, without reference to affirmative action by Congress,
and not merely a statute enacted by the State under its police
power, and which, although in some degree affecting inter-
state commerce, does not go beyond the necessities of the
case, and, therefore, is valid, at least until Congress interferes.

The distinction here suggested is not new in our jurispru-
dence. It has been often recognized and enforced by this
court. In *Gibbons* v. *Ogden*, 9 Wheat. 1, 203, 210, this court
recognized the possession by each State of a general power of
legislation, that "embraces everything within the territory of
a State, not surrendered to the General Government; all
which can be most advantageously exercised by the States
themselves." Inspection laws, although having, as the court
said in that case, "a remote and considerable influence on

commerce," are yet within the authority of the States to enact, because no direct, general power over the objects of such laws was granted to Congress. So, also, quarantine laws of every description, if they have real relation to the objects named in them, are to be referred to the power which the States have to make provision for the health and safety of their people. But neither inspection, quarantine nor health laws enacted by a State have been adjudged void, by force alone of the Constitution and in the absence of Congressional legislation, simply because they remotely, or even directly, affected or temporarily suspended commerce among the States and with foreign nations. Of course, if the inspection, quarantine or health laws of a State, passed under its reserved power to provide for the health, comfort and safety of its people, come into conflict with an act of Congress, passed under its power to regulate interstate and foreign commerce, such local regulations, to the extent of the conflict, must give way in order that the supreme law of the land — an act of Congress passed in pursuance of the Constitution — may have unobstructed operation. The possibility of conflict between State and national enactments, each to be referred to the undoubted powers of the State and the Nation, respectively, was not overlooked in *Gibbons* v. *Ogden*, and Chief Justice Marshall said: "The framers of our Constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the state legislatures as do not transcend these powers, but, though enacted in the execution of acknowledged state powers, interfere with or are contrary to the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In every such case the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."

These principles are illustrated in numerous decisions of this court, to some of which it is proper to refer.

In *Willson* v. *Black Bird Creek Marsh Company*, 2 Pet. 245, 251, 252, it appeared that that company claimed the right, under a statute of Delaware, to place a dam across a navigable creek, up which the tide flowed for some distance, and thereby abridge the rights of those accustomed to use the stream. This court, after observing that the construction of the dam would enhance the value of the adjoining land and probably improve the health of the inhabitants, and that such an abridgment of private rights, unless it came in conflict with the Constitution or a law of the United States, was an affair between the government of Delaware and its citizens, of which this court could not take cognizance, said: "The counsel for plaintiffs in error insist that it comes in conflict with the power of the United States 'to regulate commerce with foreign nations and among the several States.' If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the Middle and Southern States; we should feel not much difficulty in saying that a state law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. We do not think that the act empowering the Black Bird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject." Notwithstanding that case has been sometimes criticized, its authority has never been questioned in this court. On the contrary, it was declared in *Pound* v. *Turck*, 95 U. S. 459, 463, that it had never been overruled, but had always been sustained.

In *Gilman* v. *Philadelphia*, 3 Wall. 713, 729, the question was as to the validity of an act of the legislature of Pennsylvania, authorizing the construction of a bridge over the Schuylkill, "an ancient river and common highway of the State." It appeared that the bridge, if constructed, would prevent the passage up the river of vessels having masts, interfere with commerce and materially injure the value of certain wharf and dock property on the river. Congress had not passed any act on the subject, but the contention was that such an interference with commerce on a public navigable water was inconsistent with the Constitution of the United States. The court said: "It must not be forgotten that bridges, which are connecting parts of turnpikes, streets and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs. It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other. The States have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases to the paramount authority of Congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the nation."

In *Cooley* v. *Board of Wardens, etc.*, 12 How. 299, 320, it was adjudged that the mere grant to Congress of the power to regulate commerce did not deprive the States of power to regulate pilots on the public navigable waters of the United States.

In *Owners of Brig James Gray* v. *Owners of Ship John Fraser*, 21 How. 184, 187, the court held to be valid two ordinances of the city of Charleston, one providing that no vessel should be in the harbor of that city for more than twenty-four hours, and inflicting certain penalties for every disobedience of the ordinance; the other requiring all vessels anchored in the harbor to keep a light burning on board from

dark until daylight, suspended conspicuously midships, twenty feet high from the deck. The court said : "The power of the city authorities to pass and enforce these two ordinances is disputed by the libellants. But regulations of this kind are necessary and indispensable in every commercial port for the convenience and safety of commerce. And the local authorities have a right to prescribe at what wharf a vessel may lie and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor and for what time, and what description of light she shall display at night to warn the passing vessels of her position, and that she is at anchor and not under sail. They are like to the local usages of navigation in different ports, and every vessel, from whatever part of the world she may come, is bound to take notice of them and conform to them. And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States."

In *Railroad Company* v. *Fuller*, 17 Wall. 560, 567, 570, the question was as to the validity of a statute of Iowa requiring that each railroad company should, in the month of September, annually, fix its rates for the transportation of passengers and of freights of different kinds; that it should put up a printed copy of such rates at all its stations and depots, and cause a copy to remain posted during the year; and that a failure to fulfil these requirements, or the charging of a higher rate than was posted, should subject the offending company to the payment of the penalty prescribed. The court said : "In all other respects there is no interference. No other constraint is imposed. Except in these particulars the company may exercise all its faculties as it shall deem proper. No discrimination is made between local and interstate freights, and no attempt is made to control the rates that may be charged. It is only required that the rates shall be fixed, made public and honestly adhered to. In this there is nothing unreasonable or onerous. The public welfare is promoted without wrong or injury to the company. The statute was

doubtless deemed to be called for by the interests of the community to be affected by it, and rests upon a solid foundation of reason and justice. It is not, in the sense of the Constitution, in any wise a regulation of commerce." Again: "If the requirements of the statute here in question were, as contended by the counsel for the plaintiff in error, *regulations of commerce*, the question would arise whether, regarded in the light of the authorities referred to, and of reason and principle, they are not regulations of such a character as to be valid until superseded by the paramount action of Congress. But, as we are unanimously of opinion that they are merely police regulations, it is unnecessary to pursue the subject."

In *Railroad Co.* v. *Husen*, 95 U. S. 465, 470–473, the court, while holding to be invalid under the Constitution of the United States a statute of Missouri, which met at the borders of the State a large and common subject of commerce, and prohibited its crossing the line during two thirds of each year, except subject to onerous conditions, which obstructed interstate commerce and worked a discrimination between the property of citizens of one State and that of citizens of other States, said that "the deposit in Congress of the power to regulate foreign commerce and commerce among the States was not a surrender of that which may properly be denominated police power;" that the power extended "to making regulations of domestic order, morals, health and safety," but could not be exercised over a subject confided exclusively in Congress, nor invade the domain of the National Government, nor by any law of a police nature interfere with transportation into or through the State, "beyond what is absolutely necessary for its self protection." The court, in that case, concluded with these words: "The police power of a State cannot obstruct foreign commerce or interstate commerce *beyond the necessity for its exercise;* and under color of it objects not within its scope cannot be secured at the expense of the protection afforded by the Constitution. And as its range sometimes comes very near to the field committed by the Constitution to Congress, it is the duty of the courts to guard vigilantly against any *needless intrusion.*"

A leading case upon the subject is that of *Morgan* v. *Louisiana*, 118 U. S. 455, 463–465, which related to certain quarantine laws of Louisiana, the validity of which were questioned partly upon the ground that they were inconsistent with the power of Congress to regulate commerce among the States. This court said: "Is the law under consideration void as a regulation of commerce? Undoubtedly it is in some sense a regulation of commerce. It arrests a vessel on a voyage which may have been a long one. It may affect commerce among the States when the vessel is coming from some other State of the Union than Louisiana, and it may affect commerce with foreign nations when the vessel arrested comes from a foreign port. This interruption of the voyage may be for days or weeks. It extends to the vessel, the cargo, the officers and seamen and the passengers. In so far as it provides a rule by which this power is exercised, it cannot be denied that it regulates commerce. We do not think it necessary to enter into the inquiry whether, notwithstanding this, it is to be classed among those police powers which were retained by the States as exclusively their own, and, therefore, not ceded to Congress. For, while it may be a police power in the sense that all provisions for the health, comfort and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, even where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Henderson* v. *The Mayor*, 92 U. S. 259, 272; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661. But it may be conceded that whenever Congress shall undertake to provide for the commercial cities of the United States a general system of quarantine, or shall confide the execution of the details of such a system to a National Board of Health, or to local boards, as may be found expedient, all state laws on the subject will be abrogated, at least so far as the two are inconsistent. But, until this is done, the laws of the State on the subject are valid." Again: "Quarantine laws belong to that class of state legislation which, whether passed with intent to

regulate commerce or not, must be admitted to have that effect, and which are valid until displaced or contravened by some legislation of Congress."

Upon the subject of legislation enacted under the police power of a State, and which, although affecting more or less commerce among the States, was adjudged to be valid, until displaced by some act of Congress, the case of *Smith* v. *Alabama*, 124 U. S. 465, 474, 479, 482, is instructive. A statute of Alabama made it unlawful for an engineer on a railroad train in that State to operate an engine upon the main line of the road used for the transportation of passengers or freight, without first undergoing an examination and obtaining a license from a State Board of Examiners. The point was made that the statute, in its application to engineers on interstate trains, was a regulation of commerce among the States, and repugnant to the Constitution. This court referred to and reaffirmed the principle announced in *Sherlock* v. *Alling*, 93 U. S. 99, 102, where it was said: "In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution." Referring to the fact that Congress had prescribed the qualifications for pilots and engineers of steam vessels engaged in the coasting trade and navigating the inland waters of the United States, while engaged in commerce among the States, the court, in *Smith* v. *Alabama*, said that the power of Congress "might, with equal authority, be exercised in prescribing the qualifications for locomotive engineers employed by railroad companies engaged in the transportation of passengers and goods among the States, and in that case would supersede any conflicting provisions on the same subject made by local authority. But the provisions on the subject contained in the statute of Alabama under consideration are not regulations of interstate commerce. It is a misnomer to call them such. Considered in themselves they

are parts of that body of the local laws which, as we have already seen, properly governs the relation between carriers of passengers and merchandise and the public who employ them, which are not displaced until they come in conflict with express enactments of Congress in the exercise of its power over commerce, and which, until so displaced, according to the evident intention of Congress, remain as the law governing carriers in the discharge of their obligations, whether engaged in the purely internal commerce of the State or in commerce among the States. No objection to the statute, as an impediment on the free transaction of commerce among the States, can be found in any of its special provisions." Again: "We find, therefore, first, that the statute of Alabama, the validity of which is under consideration, is not, considered in its own nature, a regulation of interstate commerce, even when applied as in the case under consideration; secondly, that it is properly an act of legislation within the scope of the admitted power reserved to the State to regulate the relative rights and duties of persons being and acting within its territorial jurisdiction, intended to operate so as to secure for the public safety of persons and property; and, thirdly, that, so far as it affects transactions of commerce among the States, it does so indirectly, incidentally and remotely, and not so as to burden or impede them, and, in the particulars in which it touches those transactions at all, it is not in conflict with any express enactment of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence."

So in *Nashville etc. Railway* v. *Alabama*, 128 U. S. 96, 99, 101, which involved the validity of a state enactment which, for the protection of the travelling public, declared any one disqualified from serving on railroad lines within the State who had color blindness and defective vision, and which statute was equally applicable to domestic and interstate railroad trains, the court said: "It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may legislate as to the qualifications, duties and liabilities of employés and others on railway trains engaged in that commerce; and that such legislation will

supersede any state action on the subject. But until such legislation is had, it is clearly within the competency of the States to provide against accidents on trains whilst within their limits. Indeed, it is a principle fully recognized by decisions of state and Federal courts that wherever there is any business in which, either from the products created or the instrumentalities used, there is danger to life or property, it is not only within the power of the States, but it is among their plain duties, to make provision against accidents likely to follow in such business, so that the dangers attending it may be guarded against so far as is practicable." Referring to some observations made in *Smith* v. *Alabama, supra,* the court said: "The same observations may be made with respect to the provisions of the state law for the examination of parties to be employed on railways with respect to their powers of vision. Such legislation is not directed against commerce, and only affects it incidentally, and therefore cannot be called, within the meaning of the Constitution, a regulation of commerce."

These authorities make it clear that the legislative enactments of the States, passed under their admitted police powers, and having a real relation to the domestic peace, order, health and safety of their people, but which, by their necessary operation, affect to some extent, or for a limited time, the conduct of commerce among the States, are yet not invalid by force alone of the grant of power to Congress to regulate such commerce; and, if not obnoxious to some other constitutional provision or destructive of some right secured by the fundamental law, are to be respected in the courts of the Union until they are superseded and displaced by some act of Congress passed in execution of the power granted to it by the Constitution. Local laws of the character mentioned have their source in the powers which the States reserved and never surrendered to Congress, of providing for the public health, the public morals and the public safety, and are not, within the meaning of the Constitution, and considered in their own nature, regulations of interstate commerce simply because, for a limited time or to a limited extent, they cover

the field accupied by those engaged in such commerce. The statute of Georgia is not directed against interstate commerce. It establishes a rule of civil conduct applicable alike to all freight trains, domestic as well as interstate. It applies to the transportation of interstate freight the same rule precisely that it applies to the transportation of domestic freight. And it places the business of transporting freight in the same category as all other secular business. It simply declares that, on and during the day fixed by law as a day of rest for all the people within the limits of the State from toil and labor incident to their callings, the transportation of freight shall be suspended.

We are of opinion that such a law, although in a limited degree affecting interstate commerce, is not for that reason a needless intrusion upon the domain of Federal jurisdiction, nor strictly a regulation of interstate commerce, but, considered in its own nature, is an ordinary police regulation designed to secure the well-being and to promote the general welfare of the people within the State by which it was established, and, therefore, not invalid by force alone of the Constitution of the United States.

The judgment is                           *Affirmed.*

The CHIEF JUSTICE, with whom concurred MR. JUSTICE WHITE, dissenting:

Intercourse and trade between the States by means of railroads passing through several States, is a matter national in its character and admitting of uniform regulation. The power of Congress to regulate it is exclusive and under the Constitution it is free and untrammelled except as Congress otherwise provides. This statute in requiring the suspension of interstate commerce for one day in the week amounts to a regulation of that commerce, and is invalid because the power of Congress in that regard is exclusive. But it is said that the act is not a regulation of commerce but a mere regulation of police, and that the so called police power of a State is plenary. The result, however, is the same. When a power of a State and

a power of the General Government come into collision, the former must give way; and as the freedom of interstate commerce is secured by the Constitution, except as Congress shall limit it, the act is void because in violation of that freedom.

MR. JUSTICE BREWER did not hear the argument in this case, and took no part in its decision.