**TWO GUYS FROM HARRISON–ALLENTOWN, INC., Plaintiff,**

v.

**Paul A. McGINLEY, District Attorney, County of Lehigh, Pennsylvania, Defendant.**

**Civ. A. No. 25626.**

United States District Court
E. D. Pennsylvania.
Dec. 1, 1959.

946

Dilworth, Paxson, Kalish, Kohn & Dilks, by Harold E. Kohn and William T. Coleman, Jr., Oscar Brown, Philadelphia, Pa., Morris Efron, Allentown, Pa., for plaintiff.

Paul A. McGinley, Dist. Atty. of Lehigh County, Ernest F. Ritter, First Asst. Dist. Atty., Allentown, Pa., for defendant.

Harry J. Rubin, Sp. Atty., York, Pa., for Commonwealth of Pennsylvania.

Morgan, Lewis & Bockius, by W. James MacIntosh, and Benjamin M. Quigg, Jr., Philadelphia, Pa., for Pennsylvania Retailers Ass'n, amicus curiae.

Albert K. Plone, Camden, N. J., Kenneth Trommer, Philadelphia, Pa., amici curiae.

Before HASTIE, Circuit Judge, WELSH, Senior District Judge, and LORD, District Judge.

HASTIE, Circuit Judge.

This case has been tried to a statutory three-judge court constituted as provided in Sections 2281 and 2284 of Title 28, United States Code. The plaintiff, Two Guys From Harrison-Allentown, Inc., seeks an injunction to prevent the District Attorney of Lehigh County from enforcing against its employees, and thus against its retail selling business, the criminal sanctions of the Pennsylvania Sunday closing laws, sometimes called the Sunday "blue laws". Continuously since 1957 plaintiff has operated a large department store, employing some 300 persons, in a suburban area near the City of Allentown in Lehigh County. This store opens for business on Sunday as well as on the other six days of the week. About one-third of its business is done on Sunday.

The pleadings allege and the evidence establishes as a fact that, prior to a 1959 amendment of the "blue laws", the defendant had undertaken to enforce against the plaintiff's business and its employees the general provision of the Act of June 24, 1939, P.L. 872, § 699.4, 18 P.S. § 4699.4 that "whoever does or performs any worldly employment or business whatsoever on the Lord's day, commonly called Sunday (works of necessity and charity only excepted) * * shall, upon conviction thereof in a summary proceeding, be sentenced to pay a fine of four dollars * * *." It is also alleged and appears as a fact that the defendant is now threatening to enforce against the plaintiff's business and employees Section 699.10 as added to the Sunday closing law by the Act of August 10, 1959, P.L. 212, 18 P.S. § 4699.10, which reads as follows:

"Whoever engages on Sunday in the business of selling, or sells, or offers for sale on such day at retail, clothing and wearing apparel, clothing accessories, furniture, housewares, home, business, or office fur-

nishings, household, business, or office appliances, hardware, tools, paints, building and lumber supply materials, jewelry, silverware, watches, clocks, luggage, musical instruments and recordings, or toys, excluding novelties and souvenirs, shall upon conviction thereof in a summary proceeding for the first offense be sentenced to pay a fine of not exceeding one hundred dollars ($100), and for the second or any subsequent offense committed within one year after conviction for the first offense be sentenced to pay a fine of not exceeding two hundred dollars ($200) or undergo imprisonment not exceeding thirty days in default thereof.

"Each separate sale or offer to sell shall constitute a separate offense * * *."

The evidence does not show and the court does not find any present or continuing threat to enforce against plaintiff's retail selling the above quoted provision of the 1939 statute, although the defendant has expressed the legal view that both the old Section 699.4 and the new Section 699.10 apply to the situation of the plaintiff.

■ In these circumstances a question arises at the outset which affects the scope of proper present inquiry. Since the 1959 amendment has made the retail sale of specific categories of merchandise on Sunday a wrong punishable by a fine of one hundred dollars, does the sale of such merchandise continue to be punishable by a fine of four dollars under the older general prohibition of "worldly employment or business on Sunday"?

The 1959 enactment says nothing about the earlier general prohibition although it was enacted as an amendatory addition to Section 699 of the Penal Code in which the earlier prohibition appears. We think it can reasonably be argued that the new section supersedes the older one insofar as the latter covered in generality activities now specifically dealt with and more severely punished in the amendatory enactment. Cf. Commonwealth v. Brown, 1943, 346 Pa. 192, 29 A.2d 793; Commonwealth v. Gross, 1941, 145 Pa.Super. 92, 21 A.2d 238. In any event, here is a substantial unsettled question concerning the construction of the questioned state legislation. When the Pennsylvania courts decide this question they may well resolve it by an interpretation which will relieve the plaintiff and those associated with it of any punitive action under the 1939 statute.

■ In such a situation it is our duty to refrain from passing upon the constitutionality of the 1939 statute until the state courts have made clear whether it applies at all to the plaintiff since the 1959 amendment. Harrison v. N. A. A. C. P., 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Spector Motor Service v. McLaughlin, 1944, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. Even if the statute were clear, a court of the United States should, as a matter of policy to minimize interference with state action, refuse gratuitously to pass on the constitutionality of a provision of a state law when the plaintiff cannot show present urgent need for federal intervention to prevent actual or imminently threatened deprivation of constitutional right. Plaintiff is in no such jeopardy now under the 1939 statute. In these circumstances we think it inappropriate to pass upon the constitutionality of the 1939 statute at this time or even, as was done in the cases cited above, to hold the case sub judice pending an interpretive state ruling. It is enough to say that our disposition of the present case shall not bar future resort to this court by the plaintiff if and when the state courts shall authoritatively decide that the 1939 statute still applies to selling which is covered by the 1959 amendment, and if and when plaintiff's business shall be jeopardized by a present threat of prosecution under the 1939 statute. The present adjudication will concern the 1959 amendment only.

■ Plaintiff attacks the Pennsylvania legislation commanding the cessation of certain worldly activity on Sunday as state action promoting "an establishment of religion" contrary to the prohibition of the First Amendment, as made applicable to the states by the Fourteenth Amendment. The argument is that this required cessation of business on Sunday is an enforced expression of respect for and acknowledgement of the sacred character and religious symbolism of the Christian Sabbath, a religious institution commemorating the resurrection of Christ. There is testimony which establishes as a fact in this record that this view of the religious significance of enforced Sunday work stoppage is sincerely held by many persons whose religion does not recognize the divinity or resurrection of Jesus of Nazareth or the sacredness of Sunday as the "Lord's day".

At the outset we consider a contention that this First Amendment argument has been foreclosed by authoritative determinations of the constitutionality of Sunday laws essentially similar to the Pennsylvania statute. At the turn of the century, before the Supreme Court had ruled that the First Amendment guarantees are enforceable through the Fourteenth Amendment against the states,[1] Sunday "blue laws" were upheld in two familiar decisions of the Court. Petit v. State of Minnesota, 1900, 177 U.S. 164, 20 S.Ct. 666, 44 L.Ed. 716;[2] Hennington v. State of Georgia, 1896, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166. If these stood alone their present authority would be questionable in the light of the development of constitutional concepts during this century. But more re-

cently a new test of the constitutionality of Sunday legislation was sought in an appeal to the Supreme Court from a conviction under the New York Sunday laws. Friedman v. People of State of New York, 1951, 341 U.S. 907, 71 S.Ct. 623, 95 L.Ed. 1345. In the jurisdictional statement filed in the Supreme Court in support of that appeal the appellant said: "The question to be resolved is an important one: Are Hennington v. Georgia and Petit v. Minnesota still law in view of the [Everson v. Board of Education of Ewing Tp., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711; 330 U.S. 855, 67 S.Ct. 962, 91 L.Ed. 1297 and People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648] decisions?" Accordingly, it is appropriate that we examine that case carefully.

■ The defendants in the Friedman case, who were Orthodox Jews, had been convicted of the retail selling of kosher meat on Sunday in violation of the New York prohibition against "all manner of public selling [except for many miscellaneous exemptions] * * * upon Sunday * * *." 39 N.Y.Consol. Laws, McKinney, 1944, § 2147. The defense was carefully planned and organized under the direction of Leo Pfeffer, Esquire, a distinguished advocate and legal writer who had specialized in the field of religious liberty.[3] Before the Supreme Court the appellant's very explicit statement of "Questions Presented" read in part as follows:

"1. Whether the New York Sabbath Law (Article 192 of the New York Penal Law) is a law respecting an establishment of religion

---

1. The ruling as to freedom of religion was first made in 1940 in Cantwell v. State of Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352, although first foreshadowed fifteen years earlier. Gitlow v. People of State of New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138.

2. See also the earlier dictum in Soon Hing v. Crowley, 1885, 113 U.S. 703, 710, 5 S.Ct. 730, 734, 28 L.Ed. 1145:

"Laws setting aside Sunday as a day of rest are upheld, not from any right of the government to legislate for the promotion of religious observances, but from its right to protect all persons from the physical and moral debasement which comes from uninterrupted labor:"

3. Pfeffer's, Church, State, and Freedom, 1953, discusses Sunday laws in general and the Friedman case in detail at pages 227–241.

and is, therefore, invalid in its entirety under the First Amendment to the United States Constitution which is made applicable to the States by the Fourteenth Amendment.

"2. Whether the New York Sabbath Law is constitutionally invalid as violative of the freedom of religion provision of the United States Constitution, because it fails to exempt from its operations persons whose religious convictions compel them to observe a day other than Sunday as their holy day of rest.

"3. Whether the New York Sabbath Law by reason of its 'crazy quilt' pattern of inclusions and exclusions is arbitrary and discriminatory and therefore violative of the 'equal protection of the law' and 'due process' provisions of the United States Constitution."

Of course these points were appropriately elaborated. Moreover, they had been raised at trial and had been considered and decided against the defendants by the highest court of New York. People v. Friedman, 1950, 302 N.Y. 75, 96 N.E. 2d 184. Indeed, Mr. Pfeffer points out in his book, and his submission must have made it plain to the Supreme Court, that this was essentially a test case to determine the vitality of the doctrine of the Hennington and Petit cases in the light of contemporary understanding of the reach of the First and Fourteenth Amendments. There can be no question but that the Supreme Court was plainly urged to find in the New York law the very constitutional infirmities we are now asked to find in the Pennsylvania law. Yet, without permitting oral argument the Court disposed of the case in a per curiam opinion dismissing the appeal and saying merely: "The motion to dismiss is granted and the appeal is dismissed for the want of a substantial federal question." 341 U.S. 907, 71 S.Ct. 623. In these circumstances the Friedman case seems to mean that in the Supreme Court's view such legislation as the New York law is so clearly invulnerable to First and Fourteenth Amendment attack that it would not even be useful to permit further argument of the matter.[4]

In effect, the Court was content to leave as the law of the land its old reasoning that "the legislature having * * * power to enact laws to promote the order and to secure the comfort, happiness, and health of the people, it was within its discretion to fix the day when all labor, within the limits of the state, works of necessity and charity excepted, should cease. It is not for the judiciary to say that the wrong day was fixed * * *." See Hennington v. State of Georgia, su-

---

4. As early as 1902 the Supreme Court recognized the stare decisis effect of its per curiam disposition of cases properly appealed to it. Fidelity & Deposit Co. of Maryland v. United States, 1902, 187 U.S. 315, 319, 23 S.Ct. 120, 47 L.Ed. 194. In more recent times this point has become important in the administration of the Court's rules and procedure which require that an appeal of right from a state court be supported by a jurisdictional statement, stating "the reasons why the questions presented are so substantial as to require plenary consideration * * *." Rule 15, par. 1(e), 346 U.S. 962, 28 U.S.C.A. If that showing is insufficient or unpersuasive a per curiam dismissal for want of a substantial federal question or a summary affirmance of the judgment below follows. Unless such a dismissal is grounded in some procedural or technical insufficiency of appellant's presentation, its meaning seems to be that the disposition of the federal question by the state court was clearly right. In essence, such a per curiam is likely to be a particularly emphatic ruling on the merits of the question. The Court itself has explicitly recognized such summary rulings as authoritative precedents. Baskin v. Industrial Accident Commission, 1949, 338 U.S. 854, 70 S.Ct. 99, 94 L.Ed. 523; North Coast Transportation Co. v. United States, 1944, 323 U.S. 668, 65 S.Ct. 114, 89 L. Ed. 647. See also the statement of Mr. Justice Brennan, concurring in Ohio ex rel. Eaton v. Price, 1959, 360 U.S. 246, 247, 79 S.Ct. 978, 979, 3 L.Ed.2d 1200, that, "votes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case * * *."

pra, 163 U.S. at page 304, 16 S.Ct. at page 1088.

As an inferior court asked to hold unconstitutional the Pennsylvania laws prohibiting certain Sunday retail selling, we can escape from the obligation to apply the ruling in the Friedman case only if the Pennsylvania law is so significantly different from the New York law that a different result can be reached and justified without departing from the legal view for which the Friedman case stands.

It has been suggested that the New York law differs significantly from the Pennsylvania law in two respects. First, the aim to protect the Christian Sabbath from profanation is said to be much plainer in Pennsylvania than in New York. In this connection, the text of the laws, their history and their judicial interpretation all are relevant. The basic Sunday "blue laws" of Pennsylvania, New York and many other states today are derived from colonial and early state statutes which, in turn, had been derived from British laws designed to require observance and to prevent profanation of the Christian Sabbath. A hundred years before the American revolution an English statute prohibited any person from engaging in "worldly labor or business or work of the ordinary calling on the Lord's Day, works of necessity and charity excepted". 1676, 29 Car. II, C. 7. The colonial theocracies, among them both New York and Pennsylvania, adopted markedly similar legislation which they reenacted after they became states of the United States of America.[5] The basic Pennsylvania statute as it has come down to us in Section 699.4 of the codification of 1939, with its prohibition of "worldly employment or business * * * on the Lord's day", has already been set out. The New York statute, 39 N.Y.Consol. Laws, McKinney, 1944, § 2140 begins with this declaration:

"The first day of the week being by general consent set apart for rest and religious uses, the law prohibits the doing on that day of certain acts hereinafter specified, which are serious interruptions of the repose and religious liberty of the community."

Pursuant to this declaration the statute prohibits, among other things, "all manner of public selling" except for miscellaneous exemptions. § 2147. We think it cannot be seriously questioned that in their relation to the first day Sabbath as an institution of Christianity the New York and Pennsylvania statutes have a common background and were in original conception designed to the same end. Moreover, the involvement of religious considerations appears clearly on the face of the basic statute in both states.

Local judicial interpretation of the two statutes tells the same story. In the case of People v. Dunford, 1912, 207 N.Y. 17, 20, 100 N.E. 433, the Court of Appeals declared:

"That the Legislature has the authority to enact laws regulating the observance of the Sabbath day and to prevent its desecration is not, and cannot well be, disputed. The day is set apart by the statute for repose and for religious observance, objects which pertain to the physical and moral well-being of the community. As to the acts which should be prohibited as disturbances, or profanations, of the Sabbath day, the Legislature is the sole judge."

Similarly in People v. Moses, 1893, 140 N.Y. 214, 215, 35 N.E. 499, 500, this language appears:

"The Christian Sabbath is one of the civil institutions of the state; and that the legislature, for the purpose of promoting the moral and physical well-being of the people, and the peace, quiet, and good order of society, has authority to regulate its observance, and prevent its dese-

5. See the summary of the evolution of legislation against "Sabbath breaking" in New York from colonial times in the dissenting opinion of Judge McCarthy in Crown Kosher Super Market of Mass. v. Gallagher, D.C.D.Mass.1959, 176 F. Supp. 466, 477, 484.

cration, by any appropriate legislation, is unquestioned."

See also People ex rel. Moffatt v. Zimmerman, 1905, 48 Misc. 203, 95 N.Y.S. 136. Finally, in the Friedman case itself, the opinion of the New York Court of Appeals, which was submitted to the Supreme Court for review, explicitly recognized the religious origin of the New York statute. 302 N.Y. at page 79, 96 N.E.2d at page 186.

We find nothing in the cases discussing the Pennsylvania legislation and its background which makes any plainer the religious considerations which underlie the adoption of the "blue laws" of that state and from time to time have been utilized to justify them. The historical religious connection is so clear in both state statutes as to be obvious and indisputable. It has been stressed that the Supreme Court of Pennsylvania in upholding the local statute has gone so far as to say that "Christianity is part of the common law of Pennsylvania". Commonwealth ex rel. Woodruff v. American Baseball Club of Philadelphia, 1927, 290 Pa. 136, 143, 138 A. 497, 499, 53 A.L.R. 1027. But a New York case, People v. Ruggles, 1811, 8 Johns 290, went just as far.

■ Thus, the Supreme Court in the Friedman case was faced with very substantial indicia of the statute's relation to religion, strikingly similar to those appellant urges upon us now. We can see no basis for reasoning that the Pennsylvania statute is unconstitutionally related to an establishment of religion without bringing the New York statute under the same interdiction. Yet, the Supreme Court sustained the New York statute summarily. If the view of the establishment of religion question thus authoritatively established by the Supreme Court is to be changed it is for that Court, not an inferior court, to do so. Our conclusion that the Friedman case has broad and controlling significance on the issue of establishment of religion is contrary to the view of the majority of the three-judge district court which recently decided Crown Kosher Super Market of Mass. v. Gallagher, D.C.D.Mass.

1959, 176 F.Supp. 466. That opinion disposes of this problem of controlling authority in a brief footnote which is not elaborate enough to make the court's reasoning clear to us. It affords no useful critique of our own analysis which indicates that the Friedman precedent is controlling.

■ As a separate point the plaintiff urges that the 1959 amendment is a denial of equal protection of the laws in that it unreasonably singles out certain types of retail selling for mandatory Sunday closing under heavy penalty—a hundred dollar fine, and twice that on subsequent offenses—while many other kinds of commercial activity are either permitted on Sunday or, if prohibited, subjected only to a very small fine, in most cases only four dollars.

This line of argument against Sunday closing statutes, no less than the First Amendment argument, has a considerable history of Supreme Court adjudication. Indeed, essentially the same argument was made against another provision of the Pennsylvania "blue laws" in Commonwealth v. Grochowiak, 1957, 184 Pa. Super. 522, 136 A.2d 145. The Pennsylvania courts considered and rejected any argument that closing Sunday movies under a fifty dollar penalty, while other worldly amusements and activities were permitted, or at least prohibited under the much smaller four dollar penalty, was arbitrary and unreasonable and a denial of equal protection of the laws. The case was taken to the Supreme Court where the appeal was dismissed for failure to present a substantial federal question. 358 U.S. 47, 79 S.Ct. 40, 3 L.Ed.2d 44. In State v. Towery, 1954, 239 N.C. 274, 79 S.E.2d 513, appeal dismissed 347 U.S. 925, 74 S.Ct. 532, 98 L.Ed. 1079, a Sunday seller of general merchandise complained that a North Carolina law prevented him from operating on Sunday yet allowed drug stores to remain open and to sell the same kinds of merchandise. The North Carolina courts sustained the statute and the Supreme Court dismissed the appeal. Similar summary dismissal has been the fate of other re-

cent claims of arbitrary classification and unreasonable discrimination in the selection of certain businesses and activities for Sunday closing while others, said to be no less objectionable, remained unmolested. State v. Kidd, 1957, 167 Ohio St. 521, 150 N.E.2d 413, appeal dismissed 358 U.S. 131, 132, 79 S.Ct. 230, 3 L.Ed.2d 225; Gundaker Central Motors v. Gassert, 1956, 23 N.J. 71, 127 A.2d 566, appeal dismissed 354 U.S. 933, 77 S.Ct. 1397, 1 L.Ed.2d 1533; State v. McGee, 1953, 237 N.C. 633, 75 S.E.2d 783, appeal dismissed 346 U.S. 802, 74 S.Ct. 50, 98 L.Ed. 334. This point was also involved in the Friedman case, which has already been discussed in relation to the establishment of religion issue. Indeed, the Fourteenth Amendment argument of arbitrary classification seems to have been made as strongly there as was the First Amendment argument. See Pfeffer, Church, State and Freedom, supra, 230–234, 239–240. The New York statute was attacked as a miscellany of pointless, irrational and discriminatory differentiations in the treatment of various Sunday commercial activities. But the Supreme Court was not persuaded that the contention had sufficient merit even to require full argument.

In larger context, cases arising under the Sunday closing laws are but a striking example of the continuing reluctance of the Supreme Court to interfere with even near whimsical classifications when made by state legislatures in the selection of schemes or areas or subject matter for economic regulations. Cf. Williamson v. Lee Optical of Oklahoma, Inc., 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563; Kotch v. Board of River Port Pilot Commissioners, 1947, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1869; Tigner v. State of Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. But cf. Morey v. Doud, 1957, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485. While Morey v. Doud, indicates that the Supreme Court will still strike down what it views as the most patently arbitrary of economic classifications we cannot ignore the fact that no Sunday law has seemed to the Court to raise even a substantial question in this area.

Moreover, in the case of the 1959 amendment of the Pennsylvania law, the circumstances attending or existing at the time of its enactment affirmatively suggest a rational basis for this legislative action. In the present record it appears and we find that the 1939 closing law was observed by most retail sellers in Lehigh County, though not all, who were subject to its provisions, until the very recent opening of substantial suburban retail businesses like that of the plaintiff initiated and triggered new and rather large scale violations, and threats of others. It also appears in the testimony which is part of the legislative hearing on the bill which became the 1959 amendment of the Sunday closing law, that the small four dollar penalty of the earlier law was inadequate to deter the Sunday opening of large retail establishments which could easily absorb such small fines as an incidental cost of doing a profitable business. Moreover, it appeared that the types of commodities covered by this new enactment are principal categories of merchandise sold in these establishments which have made the problem of Sunday retail selling newly acute. It is probable that such considerations influenced the legislature's 1959 decision to make Sunday retail selling the subject of a new prohibitory enactment. In such circumstances we find it impossible to believe that the Supreme Court would treat this case as significantly different from those in which it has dismissed appeals for want of a substantial federal question.

[8, 9] Finally, it is argued that because the general prohibition in the 1939 statute against worldly activity on Sunday has for a long time not been enforced strictly or at all against many worldly Sunday activities, it is a denial of equal protection of the law to enforce the new 1959 prohibition against the Sunday retail sale of specified kinds of merchandise. On this point the evidence is clear and we find as a fact that in Lehigh County numerous commercial and recreational activities covered by the general prohibi-

-tion of the 1939 statute have long been conducted openly on Sunday, and continue, without molestation or direction to desist by the defendant or by any public officer. On the other hand, beginning in 1957 and thereafter the defendant made substantial and frequent efforts by admonition and arrest to compel the Sunday closing of numerous retail stores including plaintiff's store. This court temporarily restrained the enforcement of the 1959 statute against the plaintiff within a week after its enactment. Since that time enforcement of the "blue laws" in Lehigh County has been held in abeyance. In these circumstances, the court finds no sufficient basis for a finding as to the future pattern or procedure of enforcement of the new statute if and when judicial restraint shall be removed. The impracticability of such an anticipatory finding is made the more obvious by the fact, of which we take judicial notice, that the term of office of the defendant as District Attorney expires at the end of the calendar year 1959. Thus, on the present record we have the threat of the enforcement of the 1959 act against retail selling while many other kinds of worldly activity proscribed by the 1939 laws have continued and are likely to continue without any interference by the public authorities. Is this such a discrimination as denies equal protection of the laws?

It may well be a violation of public duty under state law for local public officers to ignore widespread violations of the 1939 law. But it does not follow that the enforcement of the 1959 statute denies the Sunday selling retailer due process of law. The controlling constitutional principle is that such selective or discriminatory behavior by administrative officers, though wrongful, is not a violation of the Constitution unless equivalent action by the state legislature would be unconstitutional. Snowden v. Hughes, 1943, 321 U.S. 1, 64 S.Ct. 397,

88 L.Ed. 497; Owensboro Water Works Co. v. City of Owensboro, 1906, 200 U.S. 38, 26 S.Ct. 249, 50 L.Ed. 361. See also Hayman v. City of Galveston, 1927, 273 U.S. 414, 416, 47 S.Ct. 363, 71 L.Ed. 714. In the situation we now are considering the administrative failure to enforce the 1939 law against certain types of Sunday activity creates a constitutional problem only to the extent that a legislative exemption of these activities from Sunday closing would do so. But we already have pointed out that the Supreme Court has repeatedly treated the fact that a Sunday closing law is a hodgepodge characterized by many and seemingly pointless exceptions and exemptions as insufficient to raise a substantial federal question. A hodgepodge in enforcement has no greater constitutional significance.[6]

On the whole case, while the court has jurisdiction of the parties and of the subject matter under Sections 1343 and 2281 of Title 28 of the United States Code, the plaintiff has failed to show any violation of the First or the Fourteenth Amendment of the Constitution of the United States. Accordingly, plaintiff is not entitled to relief in this action.

The factual statements and legal conclusions stated in this opinion shall constitute the findings of fact and conclusions of law of the court. An order may be presented dissolving the temporary injunction heretofore entered in this case. A final order and decree may be presented denying plaintiff relief.

WELSH, Senior District Judge (concurring in part and dissenting in part).

It had been my hope after discussing this deep and fundamental problem with my Associates, to arrive at a completely unanimous conclusion. But a conscientious conception of Judicial duty, whether completely warranted or not, requires me to express myself in my own way on this subject.

6. In so ruling we in no way detract from the authority of the leading case of Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, where the administrative discrimination practiced against Chinese entrepreneurs would have been no less invidious and constitutionally intolerable if directed by the legislature.

Let me say at the outset that this Court, individually and collectively, has sought to catch the spirit as well as the letter of the various arguments of all concerned. We are all in agreement on the original legislation including that of the Act of 1939. On this religious phase of the subject I can speak from personal experience. Having been born in the late seventies and having lived in an environment and atmosphere of reverence for the Sabbath until I reached my early manhood, I know whereof I speak. That legislation was the outgrowth of deep feelings of all but a microscopic minority. The framers of the Law had gone through a religious experience and a spiritual Renaissance that clearly set before them the evils of excessive worldly pleasures and an unbridled seeking and striving for worldly riches. Their principal objective was to minimize the weakening of the spiritual life by too much worldly pleasures. Labor was secondary at that time, secondary, because of the simple habits and custom of the times. Most people did their own labor. There were very few employers having control over large numbers of men. And nearly all labor, such as it was, could be suspended for a day without confusion or without inconvenience to the community.

For over a hundred and fifty years the initial legislation has been on the Statute books. Times and customs have changed, due to the different conditions under which we live. To me it seems almost an entirely different world. It is but natural that great changes should bring about a clamor for modification or repeal of those inhibitions.

An appeal for relief has been made to the Courts. Is that the proper Tribunal? After a Statute has been on the books for a hundred and fifty years or more should the Judicial Branch of the Government strike it down or should the appeal for relief be made to the Legislative Branch? Or to the people direct? Having served for many years in both the Judicial and Legislative Branches of the Government I cannot conceive that the Courts have power to make such a decision as we are asked to make in this case by the plaintiff. In expressing this conclusion I do not want to be understood as not recognizing the increased demand for a change. Sometimes the advocates of the change speak rather harshly of the framers of those laws without an understanding of the motives that prompted their enactment. Often those who resist the repeal of this legislation today, are not entirely unsympathetic with the proponents of repeal. They know that in many respects the law has been a dead letter for many years. But countless thousands of fair-minded Americans who truly love God and their neighbor, look upon these laws as something pointing to a spiritual ideal—unrealized it is true—but still an expression of a desire of a great Country and a great people to attain and reach for something higher than the flesh-pots of Egypt or the corroding gold of a Midas.

During the last half century they have seen the struggle against materialism become more and more fierce. They are now seeing mighty nations rising against each other with weapons of annihilation and destruction greater than Satan himself could devise. At home and abroad they see the misery inflicted, and their hearts are troubled. They still feel safer with a declaration of principle expressing hope for an ideal still on the books of this beloved Country. And in this global struggle they just do not want to throw the life preservers overboard to lighten the ship.

That is the way I read the feeling of our people. I am moved to say this in the hope that if both groups can see and feel what is on both sides of this question it will lead to a better understanding and a charitable goodwill on the part of all of us.

For these reasons I concur with the majority opinion in dismissing plaintiff's attack on all legislation prior to 1959.

In construing the Act of 1959 there are other considerations involved. It is frankly admitted by the sponsors of the Act that there is nothing of a religious character or element in the legislation.

One can therefore fairly ask, why then should it be tacked onto an Act that was conceived and cradled in religiosity, if not in religion? The amending Act actually is one to regulate business and to deal with the competition among business men. Such far-reaching effort to regulate the private lives of others should be bottomed on a firm Constitutional foundation, and the need, the necessity, and the evil to be controlled, fully met. We ask: Is it based on public health, public security, public morals, sanitation, water supply, education, or any of the factors that would, standing by themselves be admittedly a basis for the power of the legislative to enact?

I do not want to go over the ground so thoroughly covered by my Associates but I do not find that the legislation has met the test on any of these requirements. We all admit that under our form of Government there are things that the legislature cannot do. The fundamental rights of the people have never been at the unrestricted mercy of a possible unreasonable and arbitrary legislature. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485. And in determining whether or not the legislature has kept within the legitimate bounds it is proper for the Courts in construing legislative action to ask these very pertinent questions as stated above.

It is also the duty of the Court to take into consideration the various facts that mark the introduction of the legislation and the events leading up to such introduction. I do not think any one will seriously argue that there is such a rising tide of spiritual interest in Sunday's observance as to constitute a clamor for more stringent laws to insure the sanctity of the Christian Sabbath. The trend has been quite the reverse. Therefore, why this sudden eruption of Sabbath interest? All the facts leading up to the introduction of this Statute appear in the record and without desiring to be critical they are not particularly wholesome or praiseworthy. (This is no reflection on the County Officials.) High pressured salemanship, outstanding organizing ability, a fantastic list of prohibited activity, indicate that a single target was the objective and a single purpose to regulate business competition. In addition it was enacted a few months before a highly important State election when members of the legislature from various parts of the State were put to undue and unreasonable pressure to vote for this legislation, that they would not think of supporting if it was not connected with the Sunday closing. The proponents of the legislation admit this was a helpful feature in getting it passed.

If it is conceded that this legislation is within the power of the legislature to enact, then I cannot conceive of any future legislation that cannot also be passed. We know that far-sighted men are considering the advisability of the four-day working week, due to automation and the fear of unemployment. If this Act lies within the power of the legislature to enact, it will be establishing a precedent for drastic curtailment of the right to work in the future.

It is not like the daylight saving legislation, couched in the language of a recommendation or request, but in the language of a command subject to drastic penalty for violation.

This view is entirely too far to the left for me to say that the legislative branch has any such power without a specific grant of authority from the people. I would strike it down.