### STANDARD STEEL WORKS COMPANY *et al. v.*
### WILLIAMS, receiver, *et al.*

1. Before the judgment of this court in the case of *Standard Steel Works Co.* v. *Williams,* 155 *Ga.* 177 (116 S. E. 636), was made the judgment of the court below, not only were amendments allowed which were filed by the parties to that case who were parties to it at the first trial, but new parties, who had not been such when the case was tried, came in by interventions duly filed and raised new and distinct issues from

those raised in the pleadings which were before the court at the former hearing; and the court below properly held that as to these questions the doctrine of res adjudicata was not applicable.

2. The relief sought by the intervenors, who are the plaintiffs in error here, is not of such a character as to have the effect, if granted, of annulling or impairing the order of the Interstate Commerce Commission, under the authority of which the receiver had issued the receiver's certificates in question here. And the court erred in holding that the superior court of Richmond County was without jurisdiction to hear and determine the questions made by the intervention of plaintiffs in error, and to grant the relief sought if the allegations in the intervention were sustained.

3. The lien created by the provisions of section 2797 of the Civil Code, in favor of certain classes of creditors designated therein, does not unreasonably interfere with interstate commerce, and is not offensive to the commerce clause of the Federal constitution. Nor is that section violative of the due-process clause of the constitution; and it is not void for uncertainty, or because of a failure to provide proceedings by which it may be enforced.

No. 3926. June 13, 1924. Rehearing denied July 19, 1924.

Intervention. Before Judge Franklin. Richmond superior court. July 25, 1923.

In a proceeding to foreclose the first mortgage bonds of the Georgia & Florida Railway, the Standard Steel Works Company et al. filed interventions seeking to establish liens, on account of supplies furnished, upon the gross income of the receivership, under the Civil Code (1910), § 2797. The court below ruled against the contention of the intervenors, and that judgment was reversed by this court. 155 *Ga.* 177.

Subsequently to the decision of this court the receiver filed two amendments to his answer to the interventions. The grounds of the first amendment, filed on March 8, 1923, were, in substance, as follows: That Georgia & Florida Railway has, since its organization in 1907, been an interstate railroad of continuous operation from Augusta, Ga., to Madison, Fla., that in March, 1915, receivers were appointed for said railway by the superior court of Richmond County and the third judicial circuit of the State of Florida; that since said time the railroad has been operated as an interstate railroad by said receivers and their successors in office under the authority and direction of the two courts mentioned, and the rules and regulations of the Interstate Commerce Commission; that under the authority of the above-mentioned courts, and with the knowledge and sanction of the Interstate Commerce Commission, the predecessors of the then receiver had adopted as part of

the obligations of the receivership the underlying bonds of the Millen & Southwestern Railway Co.; that the payment of interest on said underlying bonds is necessary to the maintenance of the interstate railroad which the receiver is under the duty and responsibility of operating, such duty and responsibility flowing not only from the orders of the two State courts mentioned, but from the policy and mandate of the United States Government as expressed in the transportation act of 1920 and the actions of the Interstate Commerce Commission; that in carrying on the business of said interstate railway, especially with regard to the duty owing the public as a carrier engaged in interstate transportation, the predecessors of said receiver procured authority to purchase the Augusta Southern Railroad, subject to its then outstanding bonded indebtedness; that the payment of interest on said underlying bonds of Augusta Southern Railway is necessary to preserve the integrity of the Georgia & Florida Railway as an interstate carrier, for if said bonds are foreclosed on account of default in payment of interest the Georgia & Florida Railway will lose access to its most important terminus and connection point, Augusta, where its main offices are located, and if deprived of its line from Keysville to Augusta, said G. & F. Ry. will be unable to continue to operate and serve the public as an interstate carrier of freight and passengers, and the holders of the bonds of Augusta Southern Ry. are threatening to foreclose if interest is not paid thereon; that the property acquired by the predecessors of the receiver from Georgia & Florida Terminal Co., subject to its outstanding bonds, is essential to the operation of Georgia & Florida Ry. as an interstate railroad, being necessary and integral parts of the terminals and main line of said railway in the cities of Augusta and Valdosta; that such property is required for the proper and expeditious handling of the interstate business conducted by Georgia & Florida Ry., and it follows that payment of interest on the underlying bonds of Georgia & Florida Terminal Co. is necessary for the continuous operation of Georgia & Florida Railway as an interstate carrier and for the performance of its duty to the public in the transportation of interstate commerce; that as evidence of the value and importance to the public of Georgia & Florida Ry., as composed of the properties described, the Federal Government, acting for the welfare of the people of the United States, did, as

of Nov. 1, 1918, take over the operation and control of the Augusta Southern Railroad and Georgia & Florida Railway which were being operated as one system by the predecessors of the then receiver; that operation of said roads by the Government was continued until released by the terms of the transportation act of 1920; that said act provided, among other things, for the making of loans upon certificate of the Interstate Commerce Commission; that in conformity with the provisions of subdivisions ·(a), (b), (c), (d), (e), and (f) of section 210 of said act the receiver applied to the Interstate Commerce Commission for and obtained a loan of $800,000, to be secured by certificates of the receiver, said loan being conditioned upon the sale of an equal amount of certificates to the public; that orders authorizing the issuance of certificates in the amount of $1,600,000 were passed by the Georgia and Florida courts which appointed the receivers; that these certificates are valid and binding, notwithstanding the statute of any State to the contrary, because said certificates were issued under and by virtue of a valid act of Congress passed in the legitimate exercise of the powers conferred upon Congress by the constitution of the United States; that from the date of the receivership up to the time of filing the intervention approximately seventy per cent. of the business of Georgia & Florida Railway has been of an interstate character; that the same rails and equipment and employees used in transporting the small amount of intrastate commerce are also used for handling the larger amount of interstate commerce; that there is no separation of the income derived from the two classes of· commerce handled; that to require such separation would be to impose an unreasonable burden of expense and labor upon said interstate carrier, and would be a serious interference with interstate commerce and the discharge of its public duties by said interstate carrier; that section 2797 of the Code of Georgia is not applicable to said railway as operated and conducted by defendant as sole receiver, for the reasons: (a) said statute was enacted long before Congress had extended its control over railroads engaged in interstate commerce, and is not reasonably adapted to an interstate railroad which is subject to the regulation and control of the. Interstate Commerce Commission and the various acts of Congress relating to interstate commerce as conducted by railroads; (b) while said statute enumerates cer-

tain of the necessary expenses incident to the conduct of a railroad, it does not include other expenses which are equally necessary for the transaction of business by an interstate railroad and the discharge of the duties owing by such railroad to the public, in consequence of which said statute is a discrimination against interstate commerce, and its application against the defendant (receiver) would result in an unreasonable burden on and interference with interstate commerce; that the amount of the necessary expenses of an interstate carrier which are not provided for in said statute are the payment of interest on underlying bonds, which, if allowed to get in default, will result in foreclosure and disruption of interstate transportation, the payment of interest on receivers' certificates which have been issued pursuant to the terms of the transportation act and in conformity with the requirements of the Interstate Commerce Commission, and other named items of expenses; that since such debts can be paid only from the gross income, and as section 2797 of the Code of Georgia makes no provision for the payment of such debts, it follows that said section is inapplicable and unenforceable against the receiver, as it would result in an unreasonable burden on interstate commerce and would interfere with the plain and imperative duties of the receiver of an interstate railroad operating pursuant to the interstate-commerce act, the Federal employers liability act, the transportation act, and other paramount laws of the United States; that the enforcement of section 2797 against the receiver would violate the superior rights of the Federal government as set forth in the contract and agreement which resulted in the loan by the government of $800,000 to the receivers of the railway, the provisions of said loan so made pursuant to the Federal transportation act having precedence over any State laws or regulations relating to this carrier in connection with the conduct of its interstate business; that the section of the Code mentioned is arbitrary, unreasonable, null and void, for that it provides: "If said receiver should be removed or a vacancy occur in said office and a successor be appointed, it shall be his duty to pay the liens herein provided for, according to their date, out of any funds in the hands of such receiver, whether such liability occurred before or after his appointment;" that there is no reasonable or rational basis for requiring the debts of receivers as enumerated in said section to be paid

"according to their dates" because there has been a change in the personnel of the receiver, as each receiver represents the court, and there is a continuity of the receivership regardless of the change in personnel of receivers; that there was at that time owing to creditors of the predecessors of the defendant receiver, for debts similar to those enumerated in said code section, approximately $290,000, which originated prior to Jan. 1, 1921; that if said creditors have a lien on the gross income of the receiver and are entitled to be paid "according to their date, out of any funds in his hands as such receiver," then it would necessarily follow that the receiver could not pay current operating expenses such as wages, the purchase of coal and other necessary supplies, so that there would be no alternative for him but to cease operating the railroad, which would result in interrupting interstate commerce and greatly and unwarrantably reduce the value of the security held by the Government for the loan mentioned; that said statute is unconstitutional, because violative of par. 3, section 8, art. 1 of the Federal constitution, being a direct, unreasonable, and unconstitutional interference with interstate commerce; that the power of Congress to regulate interstate commerce is plenary and exclusive; that since the passage of the act of 1876 (Civil Code, § 2797) Congress has affirmatively asserted its authority and control over the operation of railroads engaged in interstate commerce, and the issuance of securities by such railroads by those in charge thereof; that State laws are not permitted to impede or impair interstate traffic or the usefulness of the facilities for such traffic; that said code section, as construed by the Supreme Court of Georgia, is unconstitutional and void, because it seriously and unreasonably interferes with interstate commerce, and prevents the discharge by this defendant of his public duties as a receiver of an interstate railroad engaged in interstate commerce, contrary to the provisions of par. 3, section 8, art. 1 of the Federal constitution; that to enforce the lien asserted by intervenors under said code section against the gross income of · the railroad would result in interfering with and perhaps preventing the transportation of freight, passengers, troops, government supplies, mails, and other property in commerce between the States of Georgia and Florida and other States of the United States, contrary to the public policy and regulations of the Federal

Government as set forth in the act of Congress approved June 15, 1886 (14 Statutes at Large, 66, 8 Federal Stat. Ann. 2d ed. § 5258) ; that the enforcement of said code section as construed by the Supreme Court of Georgia would result in a denial to the United States of the priority of payment to which it is entitled under the provisions of an act of Congress of March 3, 1797 (1 Statutes at Large, 676, 2 Federal Stat. Ann. 2d ed. § 3466) ; that the legislative powers of the State of Georgia are necessarily confined and limited to the confines and boundaries of the State and to persons and property within the State, and yet by the code section referred to "a lien is created on the gross income of any railroad while operated by a receiver," in favor of sundry creditors, "superior to all other liens under the laws of this State," whether such road is "either wholly or partially in this State;" that such receiver of such road is required by said statute to apply said gross income to the payment of the incidental expenses necessary to the carrying on of the business, which shall include (1) the wages of employees, (2) wood, (3) cross-ties, (4) other material furnished which may be necessary for conducting said business and keeping said property in repair, (5) the damages which may arise from loss or injury to goods, wares, and merchandise received by said road for transportation, and (6) for injuries to person and property caused by the "running of the cars on said road and for which said road is liable as common carrier under the laws of this State;" that no provision is made for the payment of taxes to the State or the United States, for income on said railroad property, nor for payment for liabilities arising under the acts of Congress for the running of cars in interstate commerce, but such liability is confined to that arising "under the laws of this State," and yet said section attempts to create a lien on the gross income of a railroad when only partially in this State, that is to say, on an entire interstate railroad partially in this State and partially in another State, and defendant says that it is beyond the power of the State of Georgia to create such lien on the gross income of the Georgia & Florida Railway, an interstate road; that the property on which said lien is made to vest is not wholly within the State of Georgia, but beyond it; that some of said gross income arises and must necessarily arise from the operation of said receivership of said interstate road in the State of Florida; that all

of such gross income did not and could not arise from operations wholly within the State of Georgia, but such gross income necessarily is composed of revenue from interstate commerce and interstate operations, as well as local revenue from operations in the State of Georgia and local revenue from operations in the State of Florida; that the whole revenue from all sources make up the gross income of the receivership, and for one State by its laws to seek to create a lien on the gross income of the interstate receivership is, in effect, to create a lien on the interstate commerce carried on by the receivership that produces such income; that said act creating a lien on the gross interstate income is a statutory burden on such interstate income and on the interstate commerce that produced such income and for which it stands and represents; that said Georgia act, as construed by the Supreme Court of Georgia, in so far as it prevents the payment of interstate obligations as required by Congress and the Interstate Commerce Commission, and particularly said receivers' certificates and interest thereon, issued as authorized by the Interstate Commerce Commission under said act of Congress, is void, and said State act is inferior to and superseded by the requirements of said interstate commerce regulations, and said State statute wherein it gives a lien upon the gross income of said interstate receivership and requires payment to creditors according to date of their claims, fixing their priority as of that time irrespective of the interstate obligations upon the gross income arising from interstate commerce, is void and is a burden upon interstate commerce, inconsistent with the regulations thereof by Congress, and unnecessarily impedes the management and disposition of said gross income as is necessitated by the interstate commerce business and regulations as now carried on and required to be carried on by interstate carriers.

The grounds of the second amendment filed on July 18, 1923, were in substance as follows: that none of the intervenors have any lien or claim on the gross receipts of said railway; that none of them recorded their claim of lien within three months from the time of furnishing said materials nor sued upon the same within six months thereafter, with the possible exception of Southern Coal Company, which filed a claim of lien under section 2795 of the Code within six months (not three) after furnishing the material, and sued therefor within six months; that the title of the act

of 1876, under which a lien is claimed, is "an act to define the duties and fix the liabilities of receivers appointed for railroad companies in certain cases, and to create liens in favor of certain creditors and provide for the enforcement of such liens, and for other purposes;" that no provision is made in said act for the enforcement of the liens thereby created; that the same is vague, uncertain, and incapable of enforcement, unless the legislature by said language intended that said liens should be regularly sued as in other cases, and, if the legislature remedied this defect by the act of 1894 (Code, § 2795) (under which the Southern Coal Company claims its lien), it is required by said act that suits to establish liens for supplies furnished receivers of railways be brought within six months after the furnishing of the material; that if this is not true, then suits to establish liens under the act of 1876 must be brought under the general law which requires the recording of liens within three months and suits within twelve months; that none of said claimants recorded their liens within three months after furnishing the materials in question, and cannot establish liens under the general law; that none of the debts sued for were contracted by the present receiver, and said act in creating liens fails to provide for any hearing or right to be heard by defendant property owner; that said act is unconstitutional, being in conflict with the fourteenth amendment to the constitution of the United States, in that the State of Georgia, by said act, deprives not only the original, but any succeeding receiver and parties interested in said railway, who have legal liens thereon, of due process of law, deprives them of the right to be heard in defense of claims of liens asserted under said act, no provision being made in said act for notice of said claims of liens to be given by the claimants to the debtor, or to the property-owner, no right given them to be heard in defense of the liens as claimed by creditors, no right given the receiver nor the railroad nor other lien creditors to be heard against said claims of lien before any competent tribunal authorized to render judgment, and for want of notice, process, and right to be heard in defense of said claims of lien said act is unconstitutional and void; that said intervenors are not entitled to any lien on the gross receipts of the said interstate railway, because the State of Georgia is without constitutional power by legislative act to create a lien on the gross receipts or gross income arising from the inter-

state commerce of interstate railroads like the Georgia & Florida Railway, as it has attempted to do by said act of 1876, and defendant charges that said act is unconstitutional and void, being in conflict with article 1, section 8, par. 3, of the constitution of the United States, whereby power "to regulate commerce among the several States" is exclusively vested in the Congress of the United States; that the gross income of said railway, as operated by defendant receiver, arises largely from the interstate commerce carried on by said railway receivership under the interstate-commerce laws of the United States, and for a State to put a lien on the gross income arising from such interstate commerce, by statutory directions as to how its said income shall be disbursed, is to regulate the interstate commerce that produces such gross income, and to unreasonably burden the same—all contrary to the provisions of the said Federal constitution and the interstate-commerce laws passed by Congress thereunder, which laws regulate and in many ways control the interstate-commerce business of the country as carried on by railroads; that said laws define how the said business shall be conducted and how the income therefrom shall be appropriated, indeed such laws go to the extent of requiring that income in excess of a fair return shall be held as trustee for the United States and paid to it accordingly; that Congress, by the interstate-commerce laws passed by it, has taken control and absolutely controls interstate commerce between the States, and, by section 20-a of the interstate-commerce act, provides that no common carrier shall issue interstate securities nor assume any such liabilities, without the consent of the Interstate Commerce Commission; that said commission was given authority to permit the issue of securities as desired by interstate carriers, in whole or in part, upon application therefor to the commission, which application every interstate carrier by railroad must make before it can issue said securities, and it is made the duty of the commission to serve a copy of such application upon the Governor of each State through which the said interstate railroad passes, and he and any other appropriate State authority is given the right by law to make to the commission "such representation as they deem just and proper for preserving and conserving the rights and interest of their people and the State respectively involved in such proceedings;" that upon the application of the receiver of the

Georgia & Florida Railway to issue receivers' certificates, as here-inbefore stated, said commission had service thereof made upon the Governors of the States of Georgia and Florida, through which said road ran; that the said Governors made no defense, and no objection of any knid was urged against the application of said receivers in the issuing of said certificates, and accordingly the said Interstate Commerce Commission authorized the same by order of March 23, 1921; that the power of said Interstate Commerce Commission, under the constitution of the United States and interstate-commerce laws passed by Congress thereunder, is exclusive and plenary, and intervenors, claiming liens by suits brought subsequently to the act of said commission authorizing said certificates, are concluded thereby, and cannot now contend to the contrary; that they made no effort to bring their rights to the attention of the commission, and did not sue until August 15, 1921, when said certificates had been issued and sold prior thereto under said order of said commission on March 23, 1921; that said intervenors are too late and cannot now attack the orders of said commission, nor of the superior court, nor of the Florida court, under which said certificates were issued and sold to the public; that the order of said commission authorizing said certificates is paramount, and intervenors were in law served with notice of the application therefor when the Governor of the State of Georgia, under whose laws they claim a lien, was served, and intervenors are concluded by the action of the commission; that the effort of the intervenors to enjoin the receiver from using any part of the gross income of the said railway for the payment of interest on said receivers' certificates, as authorized and required by the said order of the Interstate Commerce Commission of March 23, 1921, is an attack on said order, is an effort to set it aside in whole or in part in the State court, and the State court is without jurisdiction to entertain said application; that exclusive jurisdiction to set aside or prevent the carrying out of an order of the Interstate Commerce Commission in whole or in part is vested by the interstate-commerce law in the district court of the United States having jurisdiction of the parties, and in this instance the proper court is the district court for the northeastern division of the southern district of Georgia, and to all such applications the United States must be a party, and it is not a party here; that

since the rendition of the decision of the Supreme Court of Georgia the receiver has not paid any of the interest on the underlying bonds of the Millen & Southwestern Railway, the Augusta Southern Railroad, or the Georgia & Florida Terminal Co., and all such are now in default and call for payment of $20,300, and as to these obligations the receiver prays the instruction of the court; that he has paid the interest that has matured on all outstanding receivers' certificates, as he conceived such to be his duty; that since the issuance of the receivers' certificates as authorized by the Interstate Commerce Commission there has been no part of the income of said receivership that could be applied to the payment of the claims of intervenors and at the same time continue operation of the interstate railway; that at the present time there is no income available from which intervenors could be paid, and it is known to the court from the reports of the receiver that operations have yielded no net income, and that even many tax liabilities remain unpaid.

Richmond Trust Co., successor to Baltimore Trust Co., trustee under the bonds of Georgia & Florida Railway, filed an amendment adopting the amendment to the answer of the receiver. Central Union Trust Co. filed a petition for intervention, setting up that it had purchased in open market, bona fide, for full value, and without notice $100,000 in the certificates of indebtedness of the receivers of Georgia & Florida Railway; that it had recently learned of the litigation growing out of the filing of interventions by Standard Steel Works et al.; that petitioner is vitally interested in said litigation, and, conceiving that intervenors are not entitled to the lien and payment as claimed by them, it desires to bring to the attention of the court the following facts: that said certificates were issued only after the receiver had been expressly authorized to do so by the superior court of Richmond County, the circuit court of the third judicial district of Florida, and the Interstate Commerce Commission; that said railway extends from Augusta, Ga., to Madison, Fla., that when said railroad was relinquished by the Federal Government it was in a depleted condition, needed considerable repairs and improvements, and there were sundry debts maturing in January, 1921, and that the only remedy open to the receivers under the circumstances was to make application to the Federal Government for a loan under the transportation act,

to be used in paying off maturing debts and making the railway safe for travel; that after leave had been granted by the superior court of Richmond County and the circuit court in Florida to issue the $1,600,000 of certificates, the receivers presented, as required, their formal application to the Interstate Commerce Commission, setting out the facts as to said interstate railroad property, its need to the people and country, and praying permission to issue said certificates, which was granted; that the receivers issued the certificates, pledged $800,000 with the Government to secure a loan of that amount, and sold $600,000 (the original answer of the receiver sets out that the balance of $200,000 was to be distributed among creditors of the receivers, but this was not done, because of the filing of the interventions) ; that the intervenors attacked said certificates and sought to establish a lien on the gross income of said railroad under the act of 1876 (Civil Code, § 2797) ; that in the meantime the several receivers who had issued said certificates and contracted said indebtedness had retired and been succeeded by J. S. Williams, who had made answer to the interventions, but did not set up that the railway was an interstate railway; that petitioner had not been a party to the proceedings resulting in the judgment of reversal by this court, as above stated, that its rights as a certificate-holder were not set out therein, and it is not bound thereby; that the effect of said adjudication is to greatly injure and decrease the value of said receivers' certificates and petitioner's holdings therein, as there may never be any part of the gross income applicable to the payment of interest or on the principal of said certificates if said gross income should be applied to the payment of said intervenors; that in rendering its judgment the Supreme Court of Georgia was not fully informed in the premises, but was necessarily confined to the record before it; and that intervenors are not entitled to the liens claimed, for the same reasons pleaded in the second amendment to the answer of the receiver.

Mrs. Anna Anderson and a large number of other persons filed an intervention setting up that they own bonds of the Georgia & Florida Railway in the aggregate sum of $4,557,000, and pleading substantially the same matters set up by the receiver in the two amendments to his answer.

The intervenors demurred to the answer of the receiver, as

amended, on the grounds: (1) that the allegations thereof constitute no defense in law or equity to the application for injunction; (2) that no facts are set forth in the amendment which would justify the court in refusing the injunction as prayed; (3) that said receiver is estopped to set up or urge, by way of defense to said interventions, any of the matters or things set forth in said amendments to his answer, because it appears by the record of this case that the question of the right of intervenors to a lien for the payment of their several claims, upon the gross income in the receivers' hands, superior to all other liens under the laws of this State, and the question of the right of intervenors to an injunction to prevent said receiver from paying out of the gross income in his hands interest upon receivers' certificates, and upon underlying bonds of portions of the Georgia & Florida Railway, until the payment of intervenors' claims, has been adjudicated by the Supreme Court of Georgia, and the receiver is concluded and estopped by said judgment, and the issue as to intervenors' right to a lien upon the said income, and said injunction, is now res adjudicata. They also moved to strike the answer as amended, and asked that the injunction be granted as prayed. They also demurred to the intervention of Central Union Trust Co., upon the grounds: (1) that the allegations thereof do not constitute any defense in law or equity as against the claims of intervenors; (2) that it appears by the record in the case that under an order of the superior court of Richmond County, dated March 11, 1922, "all those owning or holding certificates of indebtedness of the receivers of the Georgia & Florida Railway, dated January 31, 1921, and maturing January 31, 1924, have been properly served and are now parties to the above proceeding in the matter of such intervention, and all others that have been filed prior to the 16th of January, 1922, contesting the validity or priority of said certificates or seeking to enforce alleged rights under section 2797 of the Code of the State of Georgia 1910," and that said Central Union Trust Co. is now estopped to set up or urge any of the matters or things set forth in its said intervention, because it appears by the record of this case that the question of the right of intervenors to a lien for the payment of their several claims upon the gross income in the receivers' hands, superior to all other liens under the laws of this State, and the question of the right of inter-

venors to an injunction to prevent the said receiver from paying, out of the gross income in his hands, interest upon receivers' certificates, and upon underlying bonds of portions of the Georgia & Florida Railway until the payment of intervenors' claims, has been adjudicated by the Supreme Court of Georgia, and said Central Union Trust Co. is concluded and estopped by said judgment, and the issue as to intervenors' right to a lien upon said gross income and to the said injunction is now res adjudicata. They also demurred to the intervention of Anderson et al., upon the grounds: (1) that the allegations thereof do not constitute any defense in law or equity to the right of intervenors to a lien upon the gross income of the receiver and to injunction as prayed; (2) that it appears by said intervention and by the record in the case that intervenors are holders of bonds of the railway secured by a mortgage or deed of trust to Baltimore Trust Co. (Richmond Trust Co., successor), as trustee, which is being foreclosed in this case; that all of said intervenors as such bondholders are in privity with and are represented by said trustee under the said mortgage, and said intervening bondholders are estopped to set up or urge any of the matters or things set forth in said intervention, because it appears by the record of this case that the question of the right of intervenors to a lien for the payment of their several claims upon the gross income in the receiver's hands, superior to all other liens under laws of this State, and the question of the right of intervenors to an injunction to prevent the said receiver from paying, out of the gross income in his hands, interest upon receivers' certificates and upon underlying bonds of portions of said railway, until the payment of intervenors' claims, has been adjudicated by the Supreme Court of Georgia in this case, and the said Anderson et al. are estopped by said judgment, and the issue as to intervenors' right to a lien upon the said gross income and to the said injunction is now res adjudicata. They also pleaded, as to the intervention of Central Union Trust Co., that it appears by the records of this court in this cause that the Central Union Trust Co., as the owner and holder of certificates of indebtedness of the receivers of said railway, dated Jan. 31, 1921 (together with all other owners and holders of such certificates), was made a party to this cause upon the petition of said receiver, whereon an order was made, January 16, 1922, for the service by publication

on all such owners and holders of receivers' certificates, and after the publication of said order, in accordance with the provisions of the statute in such cases provided, a judgment and order was entered dated March 11, 1922, ordering and adjudging that such service by publication had been made, and that all such owners and holders of receivers' certificates had been properly served and are now parties to the above proceeding in the matter of such indebtedness, and all others that had been filed prior to the 16th day of January, 1922, contesting the validity or priority of said certificates and seeking to enforce alleged rights under section 2797 of the Code of Georgia; that it appears by the records of this cause that the issues now set forth in the intervention of Central Union Trust Co. were put in issue or might have been put in issue in the cause between the same parties, in which a final judgment was rendered by the Supreme Court of Georgia, favorable to the contention of intervenors; that said judgment was and is a final judgment upon the merits of the cause; said judgment being rendered solely upon the pleadings and upon questions of law; that said judgment is now res adjudicata as to all matters put in issue or which might have been put in issue in said cause to which said Central Union Trust Co. was then a party. Richmond Union Trust Co., Central Union Trust Co., Anderson et al., and the receiver moved for the dismissal of the interventions, upon the grounds: (1) said interventions seek, in effect, to restrain and set aside an order of the Interstate Commerce Commission, since they seek to restrain said receiver from paying interest on $1,600,000 of receivers' certificates which were issued by the predecessors of said receiver under and by virtue of an order of the Interstate Commerce Commission; that by U. S. Judicial Code, §§ 208, 211 (Comp. St. §§ 992-994), suits to restrain or set aside orders of the Interstate Commerce Commission are required to be brought in the United States district court, and cannot be maintained in a State court, and that the court having jurisdiction of the matter is the district court of the United States for the northeastern division of the southern district of Georgia; (2) that the United States is an indispensable party to a suit to restrain or set aside an order of the Interstate Commerce Commission; that the United States cannot be joined as a party to a suit in a State court, where it has not

consented to be sued; that the United States is not a party to this cause, and therefore the same cannot lawfully proceed.

Error is assigned by Standard Steel Works et al.: (1) Upon the judgment overruling and striking the plea of res adjudicata filed by Standard Steel Works et al. (2) Upon the overruling of the demurrers of Standard Steel Works et al., to the answer of the receiver as amended, and the interventions of Central Union Trust Co. and Anderson et al. (3) Upon the refusal of the court to grant the injunction prayed. (4) Upon the judgment sustaining the plea to the jurisdiction of Anderson et al., Richmond Trust Co., and Central Union Trust Co., and dismissing the interventions of Standard Steel Works et al. The brief of counsel for plaintiffs in error states that the questions to be decided are: (1) Is the judgment of the Supreme Court on the former appeal of this case res adjudicata on the present controversy? (2) Is it necessary for the Standard Steel Works and the other intervening supply creditors (the appellants here) to move in the proper Federal court to set aside the order of the Interstate Commerce Commission approving the issue of the receivers' certificates, before they can obtain the relief which they here seek in the form of an injunction to enjoin the receiver from paying interest on the underlying bonds and on the receivers' certificates until he has paid their claims? (3) Is section 2797 of the Code of the State of Georgia in violation of the commerce clause of the Federal constitution?

Other facts will be found in the opinion.

*H. W. Johnson, Alston, Alston, Foster & Moise, S. H. Myers, W. M. Howard, Pierce Brothers,* and *C. C. Moore,* for plaintiffs in error.

*Cumming & Harper, W. K. Miller,* and *Hull & Barrett,* contra.

BECK, P. J. (After stating the foregoing facts.) The statement of facts in the case of *Standard Steel Works Co.* v. *Williams,* 155 *Ga.* 177 (116 S. E. 636), should be read in connection with the somewhat lengthy statement of facts set forth above, in order that all the questions now made may be clearly understood; and we refer to that statement of facts made in the case when it was here before, just as if the facts were here restated.

1. The plaintiffs in error insist that the judgment of this court on the former appeal of the case is res adjudicata as to the present controversy, and that the defendants in error were concluded there-

by, and that the court below erred in refusing to make application of the doctrine of res adjudicata to the questions and issues presented when the amendments and the new intervention were allowed and passed upon. If new parties had not appeared in the case below as intervenors, the contention of plaintiffs in error would seem to be sound. If the receiver alone, or the receiver and those who were parties when the case was heard in the court below prior to the first appeal to this court, were the only parties to this record, it would seem that the doctrine of res adjudicata would be conclusive as to them, although the amendments offered by the receiver and certain other parties at the former hearing of the case might have set up by way of amendment new facts and new grounds of attack upon the provisions in the act approved February 28, 1876 (Acts 1876, p. 122), relating to the duties and liabilities of receivers for railroad companies, which act was the foundation in law of the claims made by the plaintiffs in error as intervenors in the receivership proceeding pending in the superior court of Richmond County; for it is a settled principle of law that a party seeking to enforce a claim legally or equitably must present to the court, either by the pleadings or proofs, or both, all the grounds upon which he expects a judgment in his favor. He is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion, and leave the rest to be presented at a second suit if the first fail. *Conwell* v. *Neal*, 118 *Ga.* 624 (45 S. E. 910). Our statute declares that "The judgment of a court of competent jurisdiction is conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the case wherein the judgment was rendered." Civil Code, § 4336. And in the case of *Perry* v. *McLendon*, 62 *Ga.* 598, Justice Bleckley emphasizes in the following language the extent of the conclusiveness of a former judgment as to matters "put in issue, or which under the rules of law might have been put in issue in the case where the judgment was rendered:" "The effect of a judgment cannot be avoided by a difference in the pleadings when these, in the first case, could or should have been as full as those in the second, though in fact they were not. No party, plaintiff or defendant, is permitted to present his case before the court on some of its allegations, and, if it fails, set it up again on the rest in a

subsequent proceeding, and thus evade the bar of the former judgment. It is the body of the case, and not certain of its limbs only, that the final judgment takes hold upon. . . He must discharge all of his weapons, and not reserve a part of them for use in a future encounter. He must realize that one defeat will not only terminate the campaign, but end the war." This same doctrine, in its full extent, is recognized in numerous cases, which it is unnecessary to cite here, because the principle is a familiar one. Nor is it necessary to restate in detail the facts alleged in the original answer of the receiver for the purposes of a comparison between the original answer and the amendments thereto. We content ourselves with saying that a comparison of the original answer and the amendments shows that no material facts are pleaded in the amendments which might not "under the rules of law" have been put in issue in the case wherein the judgment was rendered. Nor is any question made in the amendments as to the constitutionality of section 2797 of the Civil Code, which embodies the provisions in the act of February 28, 1876, that might not have been made at the hearing of the case wherein was rendered the judgment reviewed when this case was here before. And the fact that these amendments were offered before the remittitur from this court was made the judgment of the court below would not have availed the receiver and those who were parties at the time of the former trial, had new parties come in and been made parties to the case as intervenors; for if new parties were made, they had the right to have the case adjudicated upon the issues presented in their intervention. The former judgment was conclusive between the parties and their privies, but not conclusive upon those who were not parties at the former trial and who were not privies to those who were actually parties. A party to be bound by a judgment must be a party to the judgment and have notice of the proceeding, so that he can be heard; else he is not bound by the judgment, and the doctrine of res adjudicata is not applicable to him nor to the questions made when he is permitted subsequently to become a party to the suit by intervention or otherwise. Certain of the parties who became so by intervention subsequently to the former judgment of this court were not parties to the case at the prior hearing. Central Union Trust Company, Mrs. Anna ,Anderson, and certain others were not parties on a former appeal,

nor are they privies to parties on a former appeal. Central Union Trust Company is the holder of receiver's certificates, and as such filed its intervention; and it is insisted in the brief of counsel for plaintiffs in error that the certificate-holders were served by publication upon request of the receiver, and that this service was duly perfected by order of the superior court. And it appears from the record that the receiver did petition that there should be service by publication upon the certificate-holders; and the judge of the superior court of Richmond County, on the 19th day of January, 1922, upon that petition passed the following order:

"The within petition read and considered. The facts stated therein have been shown to my satisfaction to be true. It is ordered and adjudged that the clerk of this court shall issue a citation in the following form, which citation shall be published in the Augusta Herald twice a month for two months, that is, twice in January and twice in February, 1922, namely:

" 'Baltimore Trust Company ⎫ Superior Court,
(Richmond Trust Company, Successor) ⎬ Richmond County,
vs. ⎪ Georgia.
Georgia & Florida Railway ⎭ May Term, 1915.

" 'To all those owning or holding certificates of indebtedness of the Receivers of the Georgia and Florida Railway, dated January 31st, 1921, and maturing January 31, 1924.

" 'You are hereby notified that the H. L. Cory Coal Company, the Baldwin Locomotive Works, and certain other intervenors in the above-stated case have alleged and insisted that some of the purposes for which the aforesaid certificates were issued are unlawful, and that none of the said certificates are entitled to a lien or priority over uncertificated creditors, and are seeking to require the application of the gross income of the Receiver of the Georgia and Florida Railway to the payment of uncertificated indebtedness existing prior to January 1, 1921. You and each of you are hereby notified that a hearing will be had upon the aforesaid interventions and all objections by you, at the courthouse of Richmond County, Georgia, at 10 a. m., on the 20th day of March, 1922.

" 'Witness the Honorable Henry C. Hammond, Judge of the Superior Court of Richmond County, Georgia, and the seal of said court, this 19th day of January, 1922. D. Kerr, Clerk of Court.'

"It is further ordered that John Skelton Williams, Receiver of the Georgia and Florida Railway, shall furnish to the clerk of this court a list of the known names and addresses of the owners or holders of any of said certificates of indebtedness, and said clerk shall mail to the said owners or holders of said certificates, at such addresses, copies of the foregoing citation.

"It is further ordered that the said John Skelton Williams, Receiver, shall, through his General Counsel, notify all intervenors interested in such matters of the time and place of such hearing, such notice to be given by mailing or delivering to counsel for intervenors. This 16th day of January, 1922.

"Henry C. Hammond, J. S. C. A. C."

And on the 11th day of March, 1922, the following order was made: (After stating the case) "It having been made to appear to my satisfaction that the citation ordered to be published by an order of this court, passed January 16, 1922, has been published in accordance with such order, it is hereby ordered and adjudged that all those owning or holding certificates of indebtedness of the Receivers of the Georgia and Florida Railway, dated January 31, 1921, and maturing on January 31, 1924, have been properly served and are now parties to the above proceeding in the matter of such interventions, and all others that had been filed prior to the 16th of January, 1922, contesting the validity or priority of said certificates or seeking to enforce alleged rights under section 2797 of the Code of the State of Georgia, 1910.

"This 11th day of March, 1922.

"Henry C. Hammond, J.S.C.A.C."

Neither the petition nor the order named the defendants to be made parties, and we do not think that it was sufficient compliance with the provisions of the law as contained in sections 5556, 5557, and 5558 of the Civil Code. The petition and the order referred to the certificate-holders as a class; and it is insisted in the brief of counsel that the Richmond Trust Company intervened and was made a party, and that it was a representative of the class of certificate-holders, and that the former judgment of this court binds all the members of the class. Nor do we think that all the certificate-holders as a class became parties, as there was no attempt to show that the members of the class are so numerous that it would be impossible or impracticable to make

them all parties; nor does it seem that there was any attempt to have certain named certificate-holders made parties as representatives of a class. Moreover, we do not think that the Richmond Trust Company represented any of the certificate-holders except itself. It was plaintiff in the case as trustee of the first-mortgage bondholders, and the interest of those bondholders was in no way identical with the interest of the holders of receivers' certificates. We have dealt with only one of the certificate-holders, to show that new parties were introduced. There were others. It is not necessary to take up each one, to show that they were not parties to the former suit, and that they were not privies to the parties, and were not represented as members of a class. We are of the opinion, therefore, that the court properly overruled the plea of res adjudicata.

2. Another question presented by the record is, did the superior court of Richmond County have jurisdiction to issue the injunction sought? Or, stated in another form, is it necessary for the plaintiffs in error to move in the proper Federal Court to set aside the order of the Interstate Commerce Commission approving the issue of the receiver's certificates, before they can obtain the relief which is here sought in the form of an injunction to restrain the receiver from paying interest on the underlying bonds and on the receiver's certificates until he has paid their claims? Counsel for defendants in error in their brief and written argument lay down the proposition that suits to restrain the enforcement, operation, or execution of orders of the Interstate Commerce Commission are required to be brought in the United States district court, and the United States is an indispensable party; that in such a case the State court is without jurisdiction, and that the superior court of Richmond County was without jurisdiction to grant the injunction sought in this case. As a basis for the contention thus set down, they quote the following from the Federal deficiencies appropriation act of October 22, 1913, c. 32, 38 Stat. L. 219-220, wherein the commerce court was abolished and its functions transferred to the United States district court: "The venue of any suit hereafter brought to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the judicial district wherein is the residence of the party or any of the parties upon whose petition

the order was made, except that where the order does not relate to transportation or is not made upon the petition of any party the venue shall be in the district where the matter complained of in the petition before the commission arises, and except that where the order does not relate either to transportation or to a matter so complained of before the commission the matter covered by the order shall be deemed to arise in the district where one of the petitioners in court has either its principal office or its principal operating office. . . No interlocutory injunction suspending or restraining the enforcement, operation, or execution of, or setting aside, in whole or in part, any order made or entered by the Interstate Commerce Commission shall be issued or granted by any district court of the United States, or by the judge thereof, or by any circuit judge acting as district judge, unless the application for the same shall be presented to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a circuit judge, and unless a majority of said three judges shall concur in granting such application. When such application as aforesaid is presented to a judge, he shall immediately call to his assistance to hear and determine the application two other judges. Said application shall not be heard or determined before at least five days' notice of the hearing has been given to the Interstate Commerce Commission, to the Attorney-General of the United States, and to such other persons as may be defendants in the suit." And as matter to be construed in connection with the foregoing provisions of the act just referred to, they quote a part of section 208 of the Judicial Code, as follows: "Suits to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission shall be brought in the district court against the United States."

We agree with counsel for defendants in error that it is manifest, from the foregoing, that the enforcement, operation, or execution of orders of the Interstate Commerce Commission may be enjoined, set aside, annulled, or suspended, in whole or in part, for good cause and in a proper proceeding brought for that purpose; and that it is equally manifest that such proceeding, seeking wholly or partially to interfere with any order of the Interstate Commerce Commission, must be brought in the district court of the United States, and that the United States is an indispen-

sable party to the proceeding. But we do not agree with them in their contention that the petition of the Standard Steel Works and the other appellants, in view of the relief sought by them in their intervention, is an attack upon the order of the Interstate Commerce Commission, or that that order would be impaired if the relief sought were granted. The position taken by the defendants in error in reference to this order is expressed in paragraph 36 of the amendment filed by the receiver to his answer, which is in the following language: "That the aforesaid effort of the Standard Steel Works Company to enjoin the receiver from using any part of the gross income of the said railway for the payment of interest on said receiver's certificates, as was authorized and required by the said order of the Interstate Commerce Commission of March 23, 1921, is an attack on said order; is an effort to set it aside, in whole or in part, in this State Court, and defendant shows to this honorable court that it is without jurisdiction to entertain said application; that exclusive jurisdiction to set aside or prevent the carrying out of an order of the Interstate Commerce Commission, in whole or in part, is vested by the interstate commerce law in the district courts of the United States having jurisdiction of the parties, and in this instance the proper district court of the United States to which the Standard Steel Works Company and others should make their application is the district court for the northeastern division of the southern district of Georgia, and to all such application the United States must be a party, and it is not such a party here."

The order referred to in this paragraph of the amendment and which it is claimed is being attacked by the effort of the Standard Steel Works Company to enjoin the receiver from using any part of the gross income of the railroad for the payment of interest on the receiver's certificates was passed by the Interstate Commerce Commission at a session held on the 23d day of March, 1921, and was passed on the application of the receiver of the Georgia and Florida Railway for authority to issue $1,600,000 of their certificates of indebtedness and to pledge, sell, and otherwise dispose of these certificates. In part the application for authority to issue the certificates was as follows: "The present and prospective ability of the applicant to repay the loan and to meet its obliga-

tions in regard thereto. . . That the extent to which the public convenience and necessity will be served by the loan is that by maintaining credit the receivers will be enabled to prevent abandonment of the road, and that by making the contemplated improvements they will be enabled more efficiently to meet the transportation demands upon them." Referring to the application, the report of the Interstate Commerce Commission proceeds as follows:

"The application was accompanied by statements showing such facts in detail as we required with respect to the physical situation, ownership, capitalization, indebtedness, contract obligations, operation, and earning power of the property in control of the receivers, together with such other facts in relation to the propriety and expediency of granting the loan applied for, and the ability of the receivers to make good their obligation, as we deemed pertinent to the inquiry. The receivers have proposed to dispose of $800,000 of receivers' certificates at par, to aid in maintaining their credit and continuing the operation of the property in their custody and to finance part of the estimated cost of additions and betterments to be made; so that in effect they will provide one dollar for each dollar of loan requested to further the aforesaid purposes. After investigation we find that the making in whole of the proposed loan by the United States for the purpose and in the amounts hereinbefore set forth is necessary in order to enable the receivers properly to meet the transportation needs of the public; that the prospective earning power of the receivers, and the character and value of the security offered, afford reasonable assurance of their ability to repay the loan within the time fixed therefor, and to meet their other obligations in connection with such loan, and reasonable protection to the United States; and that the receivers are unable to provide themselves with funds necessary for the aforesaid purposes from other sources."

Following several pages of recitals which cover the details of the proposed loan and issue of receiver's certificates, the report and certificate of the Interstate Commerce Commission continued as follows:

"The application was made under oath, signed and filed by the receivers in accordance with authority conferred on them by an order of the aforesaid superior court, entered on January 25,

1921. As required by section 20-a of the interstate-commerce act, notice of the filing of the application has been given to, and a copy thereof filed with, the Governor of each of the States of Georgia and Florida, the only States in which the applicants operate. No objection to the granting of the application has been offered by the railroad, public service or utilities commission, or other authority of either of the States mentioned. We find that (1) the proposed issue of $1,600,000.00, principal amount, of receiver's certificates to be dated January 31, 1921, $800,000.00 to be designated series A, and $800,000.00 to be designated series B, both series to bear interest at the rate of eight per cent. per annum and to mature January 31, 1924; (2) the pledge of $800,000.00, principal amount, of said receiver's certificates, series A, with the Secretary of the Treasury as security for a loan from the United States under section 210 of the transportation act, 1920, as amended, and (3) the sale of $600,000.00, principal amount, of said receiver's certificates series B, at par, and the distribution of $200,000.00, principal amount, of said series B certificates as payment on account pro rata of the uncertificated indebtedness of the receivers incurred prior to January 1, 1921, (a) are for lawful objects within the duly authorized purposes of the applicants and compatible with the public interest, which are necessary and appropriate for, and consistent with, the proper performance by the applicants of service to the public as a common carrier, and which will not impair their ability to perform that service, and (b) are reasonably necessary and appropriate for such purposes."

Then follows the order of the Interstate Commerce Commission referred to above, and that order is in part as follows:

"It is ordered, that W. R. Sullivan, L. M. Williams, and J. F. Lewis, receivers of the Georgia and Florida Railway, be and they are hereby authorized (1) to issue $1,600,000.00 principal amount of receiver's certificates, to be dated January 31, 1921, of which $800,000.00 principal amount shall be designated series A, and $800,000 principal amount shall be designated series B, said certificates to bear interest at the rate of eight per cent. per annum, payable quarterly, to mature January 31, 1924, to be payable to bearer and to be substantially in the form submitted with the application; (2) to pledge $800,000.00 principal amount of said receiver's certificates, series A, with the Secretary of the Treasury

as security for a loan in the sum of $800,000.00 from the United States under section 210 of the transportation act, 1920, as amended; (3) to sell $600,000.00 principal amount of said receivers' certificates, series B, at par; and (4) to distribute $200,-000.00 principal amount of said receivers' certificates, series B, as payment on account pro rata of uncertificated indebtedness of the receivers incurred prior to January 1, 1921. It is further ordered, that, except as herein authorized, said receiver's certificates shall not be sold, pledged, repledged, or otherwise disposed of by the applicants, unless and until otherwise ordered by us."

The order which we have set forth was issued under the authority of section 20-a of the transportation act of 1920. In paragraph or subdivision (2) it is provided that "it shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed 'securities'), or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose." Paragraph (6) provides that the commission, upon receipt of any application for authority to issue securities, shall notify the Governor of each State in which the applicant carrier operates, of the application, and authorizes the Railroad Commission, the Public Utilities Commission, or other appropriate State authorities, to make representations to the Commission. Paragraph (7) makes the jurisdiction

of the commission exclusive and plenary. Paragraph (8) says that "nothing herein shall be construed to imply any guaranty or obligation as to said securities on the part of the United States."

There is nothing in the order itself as granted that can be construed as a requirement or direction to the receiver to pay the interest on receivers' certificates issued in pursuance of the order; nor is there anything in section 20-a of the act quoted above which would authorize an order containing such requirement or direction. And in the absence of anything in the order that might be construed into such a direction, requirement, or pledge, the prayers of the intervention of the Standard Steel Works Company and the other creditors joining with it cannot be construed as an attack on the order. The intervention does not seek to set aside the order, nor in any way qualify or limit its effect. It may impair the ability of the receiver to pay the interest due on the certificates, if the relief sought is granted, but it does not impair the order itself, nor the rightful claims of the holders of certificates under the terms of the order. In the certificate itself we find this stipulation: "The certificates, of which this is one, shall be and remain a first lien and claim on all the property, real, personal and mixed, including net income (but such net income may at all times be applied to the making of additions and betterments to the property of such receivers so long as these certificates are not in default) now, or that may hereafter be, in the hands of the receivers of the Georgia and Florida Railway and belonging to them as such receivers, whether originally acquired by and belonging to said railway, or acquired by said receivers, and all immunities and franchises, subject to court costs, counsel fees, trustees' fees, and the like, that have arisen or that may arise in the pending suit in which said receivers were appointed, as against all debts, obligations, or liabilities of said receivers now existing or that may arise, subject to the qualifications set forth in said orders." And in the order of the superior court of Richmond County we find the same provision. In paragraph (6) of the same order we find the following: "The said receivers shall at no time hereafter issue any certificates of indebtedness or enter into any obligations or contracts that will have a superior or equal rank or dignity with such certificates now to be issued, or that will in any way disturb or impair the validity, lien, or integrity of the

certificates now to be issued." And paragraph (9) of the same order contains the following provision: "In the event of the sale under an order of this court of the property now or that may hereafter be in the hands of such receivers and upon which the said certificates shall have a lien or claim, there shall be fixed an upset price at such sale of such an amount as will be sufficient to pay the expenses of all amounts that may be entitled to payment prior to such certificates, and the payment of certain certificates in full, both as principal and interest."

The pleadings in the superior court of Richmond County leading up to the passage of the order of January 25, 1921, authorizing the issue of these receiver's certificates, and that order itself, were both submitted to the Interstate Commerce Commission when the receiver made application, under the terms of the transportation act, for authority to issue certificates. And in the order of the Interstate Commerce Commission of March 23, 1921, authorizing the issue of the receiver's certificates, the pleadings in Richmond superior court were specifically referred to, and it was stated that it was the certificates issued under the order of January 25, 1921, which were then being authorized. It would seem from the provisions we quote above, that it was recognized that other debts might "be entitled to payment prior to said certificates," and that arrangements must be made upon a sale of the property for the payment of those prior claims. Again, it was provided that the receivers "shall at no time hereafter issue any certificates of indebtedness or enter into any obligations or contracts" that should have priority over the receiver's certificates. The debts of the Standard Steel Works Company and the other intervenors, supply creditors, existed before the order of January 25, 1921. That order provided that "hereafter" (that is, after the date of the order) no obligations should be incurred by the receiver that would have priority over the receivers' certificates. The priority of debts previously incurred is not impaired. And the relief sought by the intervention of the supply creditors is in accordance with their rights as established under the act of February 28, 1876, supra, with which there is nothing inconsistent in the order of the Interstate Commerce Commission set forth above, construed in connection with their report, which is also set forth, and the application for the order and the orders of the superior court

of Richmond County, set forth in part above. The orders of the commission and the terms of the receivers' certificates, and the order of the superior court, construed altogether, can be given a construction, without putting any strain upon the language of any of these documents, consistent with the rights of the Standard Steel Works Company and the other supply creditors, for the enforcement of which their intervention was filed;—a construction that is inconsistent with the theory of the defendants in error that renders that intervention and the relief sought by it an attack upon the order of the Interstate Commerce Commission, or into an effort to impair that order.

3. We have referred to the rights of the intervening supply creditors under the provisions of section 2797 of the Civil Code, which embodies the provisions of the act of February 28, 1876 (Acts 1876, p. 122), thereby assuming that the act just referred to was a valid, controlling statute of the State. But its validity and constitutionality is attacked. It is attacked as being unconstitutional on the grounds, that, as construed by this court, it unreasonably interferes with interstate commerce and imposes a direct burden thereon; that if the act was ever valid, it has been superseded by subsequent Federal legislation, and is now void as applied to interstate commerce; and because of its uncertainty, and because there is no provision for its enforcement. It is urged that section 2797 of the Civil Code gives a lien on the gross income of the receiver; and that, as the gross income of the receiver arises from interstate commerce as well as intrastate commerce, section 2797 is unconstitutional, for State legislation may not create a lien on gross income arising from interstate commerce. It was also said that to enforce section 2797 would interrupt, if not stop, the interstate commerce of the Georgia and Florida Railway, and so that section is unconstitutional as being in violation of the commerce clause of the Federal constitution. The receiver, it was said, had not sufficient income to pay his operating expenses and continue the operation of the railroad, pay interest on the underlying bonds and on the receiver's certificates, and have any surplus with which to pay the intervening creditors. He had to pay his current expenses, to manage to continue operations. If he did not pay interest on the underlying bonds and the receiver's certificates, there would be foreclosures which, it was claimed,

would interrupt and possibly stop interstate commerce; and as he had not sufficient income above current operating expenses to pay both this interest and the intervening creditors, he must pay the interest to the exclusion of the intervening supply creditors. As construed by this court when this case was before it on the former hearing, it is argued, section 2797 required payment of the claims of the intervenors before payment of the interest on the underlying bonds and the receiver's certificates. Thus construed, it was said section 2797 was unconstitutional, for if it was followed and the limited funds in the hands of the receiver used to pay the intervening creditors to the exclusion of payment of the interest, foreclosures resulting in a dismemberment of the railroad would follow that would interrupt interstate commerce. The receiver also asserted that he owed about $290,000 on old debts, similar to those due Standard Steel Works Company and others for supplies furnished to him for the operation of the railroad. These debts accrued prior to January, 1921, and had gone unpaid for a long time. There had been a change in receivers; and if the receiver was required to pay these old claims in chronological order, as required by the last sentence of section 2797, it would require all of the funds in his hands, and more besides, so that the receiver would have to cease operating the railroad for lack of funds. Thus construed, it was said section 2797 is unconstitutional, for its enforcement would result in interruption and cessation of interstate commerce. The receiver of the Georgia and Florida Railway has permitted a large accumulation of debts for supplies bought for the continued operation of the railroad. These debts were not paid as they matured. By his act of purchasing the supplies for which they were incurred the receiver agreed to a lien on the gross income coming into his hands to secure their payment. This was by force of section 2797 of the Civil Code. This lien continued and was subject to enforcement at any time. The supply creditors at any time had a right to require that the funds of the receiver be used to pay them. Section 2797 provides that "It shall be the duty of said receiver to apply the income of said railroad to the payment of the incidental expenses necessary to carrying on said business." But the receiver used his income to pay other debts, the claims in question here. He paid the interest on the underlying bonds and on the receivers' certificates

and permitted the accumulation of $290,000 of unpaid debts for incidental expenses. Section 2797 makes it his official duty to pay incidental expenses, and also gives to those to whom are due debts for incidental expenses a lien to insure performance of that duty. The present situation of the receiver results from failure to pay off the claims of those creditors who have a lien under the provisions of section 2797 of the Civil Code.

It is also further urged by the receiver that if he had paid these debts for incidental expenses, there would not have been money enough to pay the interest on the underlying bonds and the receiver's certificates, and there would long ago have been foreclosures that would have caused a sale and dismemberment of the railroad, and it would not longer be operated as a unit. That interstate commerce would be interrupted is clearly a conclusion of the receiver, alleged in his pleading. The filing of suits for the foreclosure of the underlying mortgages would not necessarily interrupt interstate commerce, nor would the enforcement of the liens claimed under section 2797 necessarily interrupt interstate commerce.. Nor would any proceedings for the enforcement of the statutory liens or contractual liens necessarily interrupt interstate commerce; for, even if the proceedings to foreclose should result in a judgment of foreclosure and an order for the sale of the railroad, the natural consequence of such a sale would cause the control and operation of it to pass out of the hands of the present receiver, but it would pass into the hands of the purchasers, and if they failed to manage it successfully, it might pass again into the hands of another receiver. The result in the long run might be that it would be impossible to operate the railroad profitably, and its operation might become so burdensome to the owners into whose hands it would pass that it might finally be scrapped; and in one sense of the word an interference with interstate commerce might result. But this would be only incidental, and would not tend to establish the conclusion urged by the receiver in his pleadings, that the intervention of the supply creditors seeking to set up their lien under section 2797 of the Code was an interference with interstate commerce.

In another branch of the argument attacking the constitutionality of section 2797, because in conflict with the commerce clause of the Federal constitution, it is urged that a statute creating a

30

lien on the gross income arising from interstate commerce is such an interference with interstate commerce as to render the act unconstitutional; and as to this proposition numerous authorities are cited in the brief of counsel for the defendants in error; and especial stress is laid on certain cases holding that it is unconstitutional for a State to impose a tax on the gross receipts of a carrier where the gross receipts arise from interstate commerce. But the lien created here, under section 2797, is a lien in favor of certain creditors who have furnished supplies essential to the operation of the railroad. It gives a security to the vendor of the supplies, and arises out of the implied contract to pay on the part of the purchaser when supplies were furnished and accepted; and we think there is an essential difference between the statutory lien created by the section of the Code under consideration as security for the price, and a tax imposed by the State. The tax is imposed without the agreement of the taxpayer; there is no bargain; there are no negotiations between the tax-imposing power and the taxpayer. The taxpayer has no voice as to the creation of the lien in favor of the taxing power. The taxing power without the consent, while exercised to raise money for public purposes, has no limit except constitutional restrictions, and may become a power to destroy; whereas the lien created under section 2797 grows out of a bargain between the operator of the railroad and the supplying creditor. Presumably the bargain was entered into for the purpose of building up and maintaining the railroad property. And we do not think the rulings made in the cases dealing with the imposition of a tax by the legislatures of States upon the gross income of a railroad are applicable to the question as to whether the legislature could create a lien like that provided for in section 2797. The case of *Southern Flour &c. Co.* v. *Northern Pac. Ry. Co.,* 127 *Ga.* 626 (56 S. E. 742, 9 L. R. A. (N. S.) 853, 119 Am. St. R. 356, 9 Ann. Cas. 437), grew out of the attachment of a car which it was insisted was employed in interstate commerce, and it was contended that to allow the attachment would be a violation of the interstate-commerce clause of the Federal constitution. In deciding the question thus made it was said: "It may sometimes happen that the prosecution of such right for the legitimate purpose of collecting a debt may incidentally affect interstate commerce, but it does not follow

that, merely because of such incidental effect, the courts will always enjoin the prosecution of the otherwise legitimate right. This principle has been recognized a number of times by the Supreme Court of the United States, though not in any case involving the collection of a debt. A case involving the application of the principle to the right of levy for the collection of a debt has not been before that court. The cases in which they have applied the principle are those involving occupation tax, public morals, public convenience, and health of people and animals, and similar cases. See Williams v. Fears, 179 U. S. 270 (21 Sup. Ct. 128, 45 L. ed. 186); Lake Shore Ry. Co. v. Ohio, 173 U. S. 285 (19 Sup. Ct. 465, 43 L. ed. 702); Missouri Ry. Co. v. Haber, 169 U. S. 613 (18 Sup. Ct. 488, 42 L. ed. 878); Hennington v. Georgia, 163 U. S. 299 (16 Sup. Ct. 1086, 41 L. ed. 166); New York R. Co. v. New York, 165 U. S. 628, 631 (17 Sup. Ct. 418, 41 L. ed. 853); Chicago Ry. Co. v. Solan, 169 U. S. 133 (18 Sup. Ct. 289, 42 L. ed. 688); Richmond R. Co. v. Patterson Tobacco Co., 169 U. S. 311 (18 Sup. Ct. 335, 42 L. ed. 759), and authorities cited in each case. But, after all, the argument in each case leads to the conclusion that if the thing attempted is in pursuance of a valid State law, its enforcement will not be stayed only because it may incidentally affect interstate commerce. The principle is applicable to the case at bar, and the plaintiff should not be precluded from collecting his debt by impounding the car in the manner attempted, because of the incidental effect it may have on the general use of the car in the matter of transporting interstate freight. To hold otherwise would in effect be to render immune from the payment of debts all property of railroads employed in interstate traffic."

And in the case of *Southern Ry. Co.* v. *Brown*, 131 *Ga.* 245 (62 S. E. 177), this court said: "The fact that a creditor, in the prosecution of his right to collect a debt by attachment of the property of his debtor, a non-resident railroad corporation, which is a common carrier, may, by the levy and sale of an empty and idle freight-car of the debtor, incidentally affect future interstate commerce, will not render such proceeding illegal. If such empty and idle freight-car was not subject to levy in Georgia because it was an instrument of interstate commerce, it would not be subject to levy in the State of the residence of the Mobile and Ohio

Railroad Company, because, if it is an instrument of interstate commerce, it would be such instrument in one place as well as another. A local corporation whose line did not extend beyond the State would likewise hold its rolling-stock immune from levy and sale if it permitted it to be used in interstate commerce and it was liable in the future to be so used, if the law were different from the rule above announced." And in the case of Johnson *v.* Union Pac. R. Co., 29 R. I. 80 (69 Atl. 298, 132 Am. St. R. 799), it is said: "The fact that an indebtedness due to a non-resident railroad company arose out of the conducting of interstate commerce does not exempt it from garnishment under a foreign attachment." See also Starkey *v.* Cleveland &c. Ry. Co., 114 Minn. 27 (130 N. W. 540, L. R. A. 1915F, 880); Cavanaugh *v.* Chicago &c. Ry. Co., 75 N. H. 243 (72 Atl. 694); Rosenbush *v.* Bernheimer, 211 Mass. 146 (97 N. E. 984, Ann. Cas. 1913A, 1317); DeRochemont *v.* New York &c. R. Co., 75 N. H. 158 (71 Atl. 868, 29 L. R. A. (N. S.) 529); Johnson *v.* Union Pac. (R. I.), 145 Fed. 249. From the case of Johnson *v.* Chicago &c. Elevator Co., 119 U. S. 388 (7 Sup. Ct. 254, 30 L. ed. 447), it appeared that the Chicago and Pacific Elevator Company owned a warehouse on land on the bank of the Chicago River. Johnson owned a tug-boat that was engaged in towing vessels on that river. Johnson's tug was the cause of damage to the warehouse when it caused a schooner that it was towing to run into the warehouse. An Illinois statute gave a lien on the tug for damages to property. The statute was attacked as unconstitutional. Of this the United States Supreme Court said: "There being no lien on the tug, by the maritime law, for the injury on land inflicted in this case, the State could create such a lien therefor as it deemed expedient, and could enact reasonable rules for its enforcement, not amounting to a regulation of commerce. Liens under State statutes, enforceable by attachment, in suits in personam, are of every-day occurrence, and may even extend to liens on vessels, when the proceedings to enforce them do not amount to admiralty proceedings in rem, or otherwise conflict with the constitution of the United States. There is no more valid objection to the attachment proceeding to enforce the lien in a suit in personam, by holding the vessel by mesne process to be subjected to execution on the personal judgment when recovered, than there is in subjecting her to seizure

on the execution. Both are incidents of a common-law remedy, which a court of common law is competent to give. This disposes of the objection that, the vessel being engaged in commerce among the States, and enrolled and licensed therefor, no lien on her could be enforced by attachment in the State court. The proceeding to enforce the lien, in this case, was not such a regulation of commerce among the States as to be invalid, because an interference with the exclusive authority of Congress to regulate such commerce, any more than regulations by a State of the rates of wharfage for vessels, and of remedies to recover wharfage, not amounting to a duty of tonnage, are such an interference, because the vessels are engaged in interstate commerce. Cannon v. New Orleans, 20 Wall. 577, 582; Packet Co. v. Catlettesburg, 105 U. S. 559; Transportation Co. v. Parkersburg, 107 U. S. 691."

In the case of The Winnebago, 205 U. S. 354 (27 Sup. Ct. 509, 51 L. ed. 836), the U. S. Supreme Court said: "It is urged that the attempt to enforce the lien on the vessel was while she was engaged in interstate commerce, and therefore proceedings against her were unlawful and void, in view of the exclusive control of this subject by Congress under the constitution and laws of the United States. But it must be remembered that, concerning contracts not maritime in their nature, the State has authority to make laws and enforce liens, and it is no valid objection that the enforcement of such laws may prevent or obstruct the prosecution of a voyage of an interstate character. The laws of the States enforcing attachment and execution in cases cognizable in State courts have been sustained and upheld. Johnson v. Chicago & Pacific Elevator Co., 119 U. S. 388-398. The State may pass laws enforcing the rights of its citizens which affect interstate commerce but fall short of regulating such commerce in the sense in which the constitution gives exclusive jurisdiction to Congress. Sherlock et al. v. Alling, 93 U. S. 99, 103; Kidd v. Pearson, 128 U. S. 1, 23; Pennsylvania R. R. Co. v. Hughes, 191 U. S. 477."

And in the case of Martin v. West, 222 U. S. 191 (32 Sup. Ct. 42, 56 L. ed. 159), the court said: "Lastly, it is contended that the statute, as interpreted by the Supreme Court of the State, offends against the commerce clause of the constitution of the United States, in that the creation and enforcement of such a lien against a foreign vessel engaged in interstate commerce is an un-

warranted interference with such commerce. We do not perceive in the statute, as interpreted and applied in the present case, any basis for this contention. As interpreted, the statute embraces all vessels, whether domestic or foreign and whether engaged in intrastate or interstate commerce, and therefore it cannot be said that its purpose is to regulate the latter. Its enforcement may occasionally and temporarily interrupt or prevent the use of a vessel in such commerce, as in this instance, but such an interference is incidental only, is almost inseparable from the compulsory enforcement of liabilities of the class in question, is not in conflict with any regulation of Congress, and does not in itself offend against the commerce clause of the constitution. Johnson *v.* Chicago & Pac. E. Co., 119 U. S. 388-400; The Winnebago, 205 U. S. 354, 362; Davis *v.* Cleveland, Cincinnati, Chicago & St. L. Ry. Co., 217 U. S. 157, 179."

We are of the opinion that while these cases do not rule the precise question which we have presented here, they do rule questions similar in principle and are applicable to the question which we now have under consideration, and that the principles ruled in them should be applied rather than the rule laid down in the cases cited by defendants in error, wherein it is held that a State may not levy a direct tax on the gross receipts derived from interstate commerce. And applying the doctrine stated in the cases from which we have made the quotations above, we have reached the conclusion that section 2797 of the Civil Code is not void on the ground that its enforcement in the proper case would be an interference with interstate commerce. And we have also reached the conclusion that section 2797 is not unconstitutional because of any uncertainty in its terms; nor is it void on the ground that it is in conflict with the due-process clause of the State and Federal constitutions. It is true that the act in itself does not contain provisions for the enforcement of such liens, which seems to have been contemplated in the caption; but the fact that the act itself is not as broad as the caption would seem to indicate does not offend any provision of our constitution. Proceedings for the enforcement of the lien might appropriately have been provided for in the act; but, as we have said, no such provision is made in it. But it does clearly create a lien in favor of parties coming within the class of creditors contemplated in the act, and it creates

that lien "on the gross income of said road" (the road placed in the hands of the receiver for the benefit of creditors or stockholders), and contains direction to the receiver to pay claims of the classes designated. It establishes a clear right to payment of the claims of such creditors out of the gross income. No machinery in the act being there provided for enforcement of the lien, the right given may be adequately enforced in the forum to which the plaintiffs in error here have appealed. The statement of their claim shows that they come within the class of creditors in whose favor the lien was created by section 2797; and by a resort to a court of equity, where an opportunity to contest the claims will be given the receiver and other parties interested, due process of law is accorded to those who oppose the establishment of the lien and the enforcement of the rights of these supply creditors.

It follows from what we have said above that while the court below properly overruled the plea of res adjudicata filed by intervenors, the Standard Steel Works Company and other supply creditors, the court erred in overruling the demurrers of the plaintiffs in error to the answer of the receiver as amended and to the interventions of Central Union Trust Company and Mrs. Anderson and others; and also erred in sustaining the plea to the jurisdiction of Richmond superior court, and in dismissing the interventions of Standard Steel Works Company and the other supply creditors.      *Judgment reversed. All the Justices concur.*

RUSSELL, C. J. I concur in the result reached by the court, and agree that what is said in the opinion is sound law aptly stated; but in my opinion the plea of res adjudicata should have been sustained, which would have obviated any further ruling of the court below.

HINES, J., concurs in the second and third divisions.